*In re:*

Harvey B. Nachman y
Stanley L. Feldstein

Núm. 108

Investigación
Conducta Profesional

RESOLUCIÓN

San Juan, Puerto Rico, a 11 de abril de 1969

Vista la queja presentada contra los abogados Harvey B. Nachman y Stanley L. Feldstein, y visto el Informe del Procurador General y el expediente de la investigación por él practicada en relación con las actuaciones de dichos abogados, se ordena al Procurador General que presente ante este Tribunal la correspondiente querella contra los susodichos abogados.

Lo acordó el Tribunal y firma el Señor Juez Presidente, quien disintió. También disintieron los Jueces Asociados, Señores Hernández Matos, Santana Becerra y Rigau. Los Jueces Asociados Señores Hernández Matos y Santana Becerra expresarán en un voto explicativo los fundamentos de sus disensos. También lo hará el Señor Juez Presidente, si lo considera necesario. El Juez Asociado Señor Blanco Lugo se reservó el derecho de exponer en un voto separado los fundamentos para sostener la procedencia de esta resolución.

(Fdo.) Luis Negrón Fernández
*Juez Presidente*

Certifico:

(Fdo.) Joaquín Berríos
*Secretario*

—O—

Opinión disidente del Juez Asociado Señor Santana Becerra en la cual concurre el Juez Asociado Señor Hernández Matos.

San Juan, Puerto Rico, a 26 de mayo de 1969

En 9 de mayo de 1966 se radicó en este Tribunal una queja suscrita por los abogados Lcdos. Francisco A. Gil, Jr., Gilberto Gierbolini Ortiz y Antonio Córdova-González imputándole a los abogados Lcdos. Harvey B. Nachman y Stanley L. Feldstein el haber incurrido en prácticas "comúnmente conocidas como perseguidores de ambulancia (*ambulance chasing*)". A la queja acompañaron declaraciones de Edgar Irizarry, jurada y suscrita ante el querellante Antonio Córdova-González en 26 de abril de 1966; de Rafael Dapena, suscrita y jurada el 29 de abril de 1966 ante la Sra. Carmen A. Carreras, Secretaria de la Corte de Estados Unidos para Puerto Rico; de Félix Martínez, jurada en 2 de febrero de 1966 ante el Juez de Distrito Hon. Juan Blaimayar; de Alfredo Arroyo, jurada y suscrita en 2 de febrero de 1966 ante el querellante Antonio Córdova-González; de Alfredo Viana Reyes, jurada y suscrita en 27 de abril de 1966 ante la Sra. Carreras, Secretaria de la Corte de Estados Unidos, y de Gregorio Morales Ayala, jurada y suscrita en 2 de febrero de 1966 ante el Juez de Distrito Hon. Juan Blaimayar.

En 8 de junio de 1966 este Tribunal remitió la queja al Procurador General a fin de que el Procurador practicara una investigación y rindiera su informe.

En 18 de enero de 1967 el Procurador General sometió su informe acompañado de declaraciones juradas tomadas por él en el curso de la investigación. En 31 de octubre de 1967 dictamos la siguiente resolución:

"Con vista del expediente, y por relacionarse las actuaciones profesionales a que el mismo se refiere, con asuntos judiciales

de la competencia del foro federal, sométase dicho expediente a la Corte de Distrito de los Estados Unidos para Puerto Rico a los fines que dicha Corte estime pertinentes, y sin perjuicio de la ulterior consideración que este Tribunal pueda dar al asunto.

Lo acordó el Tribunal y firma el Señor Juez Presidente. Los Jueces Asociados Señores Pérez Pimentel, Blanco Lugo y Ramírez Bages manifiestan no estar de acuerdo con que se refiera el asunto a la Corte Federal. El Juez Asociado Señor Belaval no intervino."

En 6 y 13 de noviembre de 1967 se remitió por la Secretaría de este Tribunal al Hon. Hiram R. Cancio, Juez del Tribunal de Distrito de Estados Unidos para Puerto Rico, el expediente del caso completo, con la investigación del Procurador General, conforme a la Resolución anterior.

El 6 de diciembre de 1968 el Hon. Hiram Cancio emitió el siguiente fallo que pasamos a transcribir sin traducirlo:

"ORDER—On May 9, 1966 the United States Attorney and the then Assistant United States Attorneys filed a request, in their individual private capacities, albeit on official stationery of their office, with the Supreme Court of Puerto Rico, requesting that the attorneys mentioned in the captioned be investigated for unprofessional conduct. The Supreme Court of Puerto Rico referred the matter to the office of Procurador General (Solicitor General) of the Commonwealth of Puerto Rico for investigation. On January 18, 1967, the matter was returned to the Supreme Court, after investigation. On October 31, 1967 the Supreme Court entered a resolution referring the matter here inasmuch as all of the alleged misconduct related to matters that were tried in the United States District Court for the District of Puerto Rico.

The United States Attorney has been directed to file a complaint specifying the charges of misconduct alleged to have been committed. No such charges have been filed within the time limit granted by this Court. Upon the Court's perusal of the record, it is not surprising that no charges have been filed because the witnesses' allegations appear not to be based upon any credible evidence of unprofessional acts. No charges having

been formulated, the Court hereby dismisses any and all proceedings against said attorneys in this Court.

A copy of this Order shall be sent to the Honorable Judges of the Supreme Court of the Commonwealth of Puerto Rico in compliance with their request.

It is so ordered.

San Juan, Puerto Rico, December 6, 1967."

En 11 de abril de 1969 una mayoría de 5 Jueces de este Tribunal ordenó al Procurador General la presentación de la correspondiente querella contra los abogados Sres. Nachman y Feldstein. Disintieron el Juez Presidente y los Jueces Asociados Señores Hernández Matos, Rigau y el que suscribe. Anuncié en ese entonces que sometería un voto explicativo de los fundamentos de mi disenso. Conforme a dicha expresión, paso a exponerlos ahora.

La Sec. 9 de la Ley de 11 de marzo de 1909, dispone que "[e]l abogado que fuere culpable de engaño, conducta inmoral (*malpractice*), delito grave (*felony*) o delito menos grave (*misdemeanor*), en conexión con el ejercicio de su profesión o que fuere culpable de cualquier delito que implicare depravación moral, podrá ser suspendido o destituido de su profesión por la Corte Suprema de Puerto Rico."

La Ley Núm. 43 de 14 de mayo de 1932 en su Art. 2 (f) concedió al Colegio de Abogados facultad para "adoptar e implantar, con la aprobación del Tribunal Supremo de Puerto Rico, los cánones de ética profesional que regirán la conducta de los abogados."

En 12 de julio de 1935 el Tribunal Supremo promulgó cánones de ética profesional adoptados por el Colegio de Abogados. Dispuso el propio cuerpo de cánones adoptado que las infracciones al mismo serían corregidas por el Tribunal Supremo de acuerdo con la jurisdicción disciplinaria de que se encuentra investido por las leyes de Puerto Rico.

La práctica profesional envuelta en este asunto tuvo lugar en su principio en relación con litigios de la jurisdic-

ción exclusiva de la Corte de Estados Unidos para Puerto Rico, por razón de la materia en litigio y como consecuencia de la decisión de *Guerrido*. Eran pleitos de la exclusiva jurisdicción federal, no de la jurisdicción concurrente que da la diversidad de ciudadanía. Al dar este Tribunal traslado del asunto a dicho Foro y disponer que dicho traslado era sin perjuicio de la ulterior consideración que este Tribunal pudiera dar al asunto, para mi se hizo la reserva, y así lo interpreto, sólo para el caso de que el Tribunal federal, en uso de sus prerrogativas y de su propio discernimiento, optara por no actuar.

El Tribunal federal, por el contrario, consideró el asunto en los méritos y lo falló conforme al dictamen anteriormente transcrito. Dice el Hon. Hiram Cancio en dicho dictamen que ordenó a los fiscales querellantes radicar la correspondiente querella especificando los cargos de conducta impropia alegadamente cometida y que dicha querella no fue radicada. No obstante, el Tribunal federal hizo su propio examen detenido del récord y concluyó que no era extraño el que no se hubieran radicado dichos cargos ya que las alegaciones de los testigos no aparecían tener base sobre evidencia creíble de conducta profesional impropia.

Entiendo que este caso quedó terminado ahí. Enjuiciar a estos abogados ahora, después del anterior fallo y por hechos ocurridos años atrás que se resucitan en 1966, me parece que constituye un proceso injustificado, no sólo a la luz de lo anteriormente expuesto, sino también a la luz de todas las demás circunstancias en el récord que pudieran relacionarse con esa conducta profesional tan difícil de concretar bajo criterios precisos que caracterizan al abogado como un cazador de ambulancias.

En adición al aspecto del asunto a que me he referido; considerando el récord ante nos; dándole a las declaraciones juradas todo el peso que de su faz tienen sin hacer juicio ahora sobre credibilidad o no credibilidad, por el valor en

sí del contenido de dicho récord y de sus circunstancias, entiendo que no hay base para determinar causa probable que lleve al enjuiciamiento disciplinario de estos abogados a la luz de las normas de derecho que se imputan infringidas. Lo dicho me obliga a hacer un recuento de hechos que están en el récord.

*Guerrido* v. *Alcoa Steamship Co.*, 234 F.2d 349 (1st Cir.).

Como cuadro de fondo que origina la situación aquí envuelta y que permite entender muchas referencias hechas en el curso de la investigación, debo hacer mención en este momento de la decisión del caso de *Guerrido*.

En 7 de octubre de 1955 la Corte de Distrito de Estados Unidos para Puerto Rico desestimó una demanda en almirantazgo interpuesta contra el buque M. V. Corona y la Compañía Alcoa Steamship Co., por un obrero que recibió lesiones a bordo de dicho barco en operaciones de descarga en la bahía de San Juan.

La Corte desestimó la demanda bajo los supuestos de derecho de que se aplicaba la Ley de Compensaciones por Accidentes del Trabajo a esas lesiones con exclusión de cualquier causa de acción sustantiva concedida por las leyes de almirantazgo de los Estados Unidos, y que la ley sustantiva de almirantazgo en que el reclamante basó su demanda no era aplicable a lesiones en aguas de Puerto Rico. (134 F.Supp. 459)

En 8 de junio de 1956, la Corte de Apelaciones del 1er. Circuito revocó. Determinó que ese obrero lesionado a bordo de un barco en la bahía de San Juan tenía una causa de acción sustantiva en almirantazgo para reclamar por sus lesiones.

El conocimiento de la decisión de la Corte de Apelaciones dio lugar, como un hecho inevitable, a que todos aquellos obreros que habían sufrido lesiones en barcos en las aguas territoriales de Puerto Rico trataran de ejercer su derecho a reclamar bajo la ley de almirantazgo, y reclamar antes de que por razón de "incuria" o tardanza, sus causas de acción

sustantivas prescribieren. En esta decisión descansa, fundamentalmente, lo que ocurrió en la Corte federal en Puerto Rico en el período que siguió a la misma, relacionado con la práctica de la profesión de los querellados.

En el caso ante la Corte de Distrito de Estados Unidos que desestimó la demanda, el obrero reclamante estuvo representado por la firma de abogados de Nueva York Golenbock y Komoroff. Ante la Corte de Apelaciones, que sostuvo la causa de acción en almirantazgo, el obrero estuvo representado por Jerome Golenbock junto a Harvey B. Nachman y la firma Golenbock y Komoroff.

**Declaración del Lcdo. Stanley L. Feldstein, prestada ante el Subprocurador General, el 28 de octubre de 1966.**

1. Se graduó de abogado en la Universidad de Columbia en junio 1950. Ejerció en Nueva York hasta el 1953, en que vino a Puerto Rico. Por no dominar el español, trabajó como ajustador de seguros hasta 1955, en que revalidó mediante examen, y comenzó a ejercer como abogado en 1956.

2. Estudió junto con el Lcdo. Harvey Nachman en la escuela de Derecho de la Universidad de Columbia y se hicieron muy amigos. Nachman, casado y con una hija, trabajaba para poder estudiar. Feldstein tomaba para él las notas de las clases a que él no podía asistir. Nachman trabajaba en Nueva York con la Oficina de Jerome Golenbock (abogado que litigó aquí y en apelación el caso de *Guerrido*). Antes de venir Feldstein a Puerto Rico, Nachman le presentó a Golenbock, y le dio cartas para abogados en Puerto Rico, entre ellos el Lcdo. Arturo Ortiz Toro, en cuya oficina pasaba mucho tiempo.

3. Aún sin haber abierto su oficina, en 1956 Nachman le envió una carta personal diciéndole que ellos (firma Golenbock) tenían varios casos de estibadores en Puerto Rico, y que deseaban un abogado local que se hiciera cargo de una oficinita que ellos tenían en el edificio de Almacenes Maríti-

mos. Se le ofreció encargarse de la oficina a sueldo o a participación. Aceptó porque todos sus medios para abrir un bufete eran $450, bono de mes y medio de sueldo concedido por la compañía de seguros al dejar el trabajo. Convino con Golenbock en recibir $75 semanales por su trabajo en los casos de Golenbock y el 27.5% de los ingresos brutos de la oficina. Por alrededor de 1 año no recibió los $75 semanales y el declarante vivía de lo que ganaba su esposa y de uno que otro caso pequeño que transigía. En el año 1957 los casos empezaban a llegar a la etapa de juicio o transacción. Los primeros casos se apelaron porque era un campo "nuevo en Puerto Rico. Nadie estaba seguro de cuál era la ley."

4. En 1958, durante una convención de NACA fue huésped de Golenbock en Nueva York. A presión de éste, y estando su esposa en estado de preñez, se vio obligado a aceptar una rebaja del por ciento, y además a darle participación a Golenbock en el producto de sus casos. El declarante en ese entonces no sabía nada de almirantazgo y al llegar los casos a la etapa de juicio, venían abogados de la oficina de Nueva York. Vinieron varios, entre ellos Nachman. Este tenía la mayor experiencia y, en 1958, se situó permanentemente en la oficina de Puerto Rico con Feldstein. En vista de discrepancias con Golenbock sobre su participación, en diciembre de 1960 adquirieron el interés de éste, y en 1961 ejercieron como Nachman y Feldstein. En agosto de 1961 el Lcdo. Héctor Laffitte, del bufete de Hartzell, se les unió como socio. Desde 1960 y durante todo el tiempo, trabajaron en el bufete varios otros abogados.

5. A partir de 1957 trabajaban en la oficina personas que ellos llamaban investigadores. Su labor era tomar declaraciones a testigos, llevar personas a exámenes médicos, notificaban emplazamientos y citaciones, se comunicaban con los clientes, y también le servían de chofer y de mensajeros.

6. Uno de ellos fue Edgar Irizarry (1960). Para esa

fecha el declarante no hablaba el español como al presente, y muchas veces no entendía el lenguaje del estibador.

". . . Otro problema era el diluvio de trabajo en la oficina, porque cuando la noticia se regó por los muelles, que habían abogados que llevaban los casos por accidentes en los muelles y 'tenían derecho,' (\*) a veces yo tenía 4 o 5 personas en la oficina en Almacenes Marítimos a preguntar: 'Licenciado, tengo derecho yo a seguro federal?' Estaban mezclando dos cosas. Pensaban posiblemente en el Fondo del Seguro, pero sabían también que se trataba de algo federal, y lo llamaban seguro federal. (\*\*) Yo necesitaba alguna ayuda. 'No necesidad de un abogado, porque no era trabajo de un abogado', sino más bien de mensajero más que nada. Mi esposa conocía a Edgar Irizarry porque trabajaba en Pan American, en la División de Carga donde ella trabajaba. . . . Ella me dijo que Edgar era una persona que 'dominaba los dos idiomas' y que era buena persona y que ella creía que era la persona apta; y además, representaría un adelanto para él, y salía del trabajo manual. Lo entrevisté . . . y lo recomendé a Golenbock y fue colocado. Entonces llegó el momento en que Edgar decía que no podía con todo el trabajo, porque ellos mayormente investigaban los casos. Por ejemplo, al recibir algún caso de un accidente, pues yo le pedía que fuera a buscarme fotografías de la escena. Si fue un caso del Fondo del Seguro del Estado, en que había un accidente reportado al Fondo, que fuera al Fondo del Seguro del Estado. Primero, cogíamos la información, pero tomaba demasiado tiempo; y entonces Golenbock me mandó una máquina portátil de hacer copias y ellos iban al Fondo del Seguro del Estado para sacar copias fotostáticas. Bueno, en fin, el trabajo era demasiado para él y él (Edgar) recomendó a este muchacho Pepín Rodríguez. El y Pepín trabajaron juntos. Pepín se fue y Edgar recomendó a Dapena; y Dapena y Edgar trabajaron juntos hasta que Edgar renunció y entonces Dapena siguió sólo. Por unos ratitos tuvimos al que ahora es abogado, Raymond Sandoval. Estudiaba y venía.

---

(\*) Decisión de *Guerrido* (1st. Cir.).

(\*\*) Decisión de *Guerrido* (1st Cir.). Se explica la confusión e incertidumbre de estos obreros. En efecto, la decisión de *Guerrido* (1st Cir.) involucra y entrelaza ambos remedios, el local bajo la Ley de Accidentes del Trabajo y el federal bajo las leyes de almirantazgo, de la exclusiva jurisdicción de la Corte de Estados Unidos.

Nosotros teníamos la práctica, y tenemos la práctica de no permitir a esos estudiantes en la oficina sin pagarle algo, porque sabíamos son muchachos pobres y pagábamos a cualquiera de esos estudiantes el mínimo federal por ley por las horas en la oficina. Raymond Sandoval trabajó un tiempo y quería quedarse, pero yo creía que estaría mejor en otra oficina, y entonces, por recomendación, me parece que del Marshal González del Tribunal Federal, vino el muchacho que actualmente trabaja con nosotros, Antonio Alvarez. Así, Pepín Rodríguez y Edgar trabajoran juntos; Dapena y Edgar Irizarry trabajaron juntos; y si mal no recuerdo, Dapena y Sandoval trabajaron juntos.

.    .    .    .    .    .    .    .

Esa representación que hacía el bufete de obreros, de trabajadores de los muelles, se concentraba en algún área la isla?

Cubría toda la isla.

Qué áreas principalmente?

No puedo decir que principalmente alguna área específica. Cubría todo . . . toda la isla. La mayoría de los casos eran del Área Metropolitana. También bastantes casos de Mayagüez y Ponce, y algunos casos de . . . por ejemplo, Arroyo, Punta Santiago, Fajardo. Me estoy refiriendo a casos marítimos. Había otros casos que no eran marítimos.

Cuál es la posición suya en cuanto a la solicitación de casos con relación a estas personas para la oficina, Dapena, Irizarry Rodríguez?

No solicitaban casos, ni a sugerencia mía ni a conocimiento mío; y posiblemente, si usted me permite, yo le puedo explicar cómo trabajábamos. Cuando yo empecé con Golenbock, yo fui presentado a Juan Pérez Roa, Presidente de la Unión de Trabajadores de Muelles y Ramos Anexas, por Golenbock. A través de Juan Pérez Rosa yo conocí a Pedro Grant, quien es cliente mío hoy día, y en aquel tiempo era secretario u organizador de la Unión. Pedro Grant fue el que me presentó al Presidente allá en Ponce, que era . . . un momentito . . . Pedro Rosa, y también me presentó al Presidente en Mayagüez. Primero yo creo que se llamaba Rodríguez Aviles, y entonces fue sustituido después, o sea, hubo un cambio y entró Ruperto Crespo. También me presentó al de Humacao, a quien no he visto en tantos años, pero si lo veo lo conozco, alto, grueso, blanco. Los casos cuando entré a la oficina, habían casos, o sea,

habían casos en manos de la oficina, y mi primer tarea fue investigar esos casos. Coger declaraciones y todos los datos para poner esos casos en condiciones de radicar, o verse, cualquiera que fuera el caso. Pedro Grant me presentó a estas personas y yo solicité, o Pedro Grant sugirió que me permitieran usar los locales de las uniones para nuestras investigaciones. Tiene que comprender que en la Zona Metropolitana es muy distinto que en esta zona de Mayagüez, por ejemplo, en Ponce, Humacao, también en Punta Santiago. El local allí, los días que un obrero no trabajaba, frecuentaba el local de la unión e iba a jugar dominó, a charlar, pasar el tiempo con los compañeros de trabajo. Muchas de estas personas que se le preguntaba su dirección, nos decían a uno que la dirección era de una hermana, o de un amigo, o que no vivía en ese sitio, pero que recibían su correspondencia ahí, porque no había entrega donde vivía. Resultó que muchas veces se escribieron cartas que no fueron devueltas, pero tampoco se recibieron. Tuvimos también el problema de que al pedir al cliente los nombres de los testigos, decía: 'Licenciado, yo no sé el nombre.' Por ejemplo, nos daba el nombre de 'El Negro', 'El Sapo', 'Tortilla'; estoy tratando de recordarme de algunos, 'El Pirata', 'El Tuerto'; uno que se llamaba, por ejemplo, 'Dorado', porque era de Dorado, y sencillamente no había manera de localizar a estas personas, sino yendo al sitio y preguntando: ¿Quién es 'El Tuerto'?, por ejemplo. A lo mejor, la misma persona de la Unión, no sabía, pero alguien decía: 'Sí, "El Tuerto", vive aquí arriba.' Además, en cuanto a economía, y hay recordar que la ganga que trabajaba en la bodega de un barco consistía de 8 obreros, 2 'wincheros', 1 amantero, un capataz y los plancheros. A mi me instruyeron mis socios y compañeros, que para tener un caso que no se iba a . . . este . . . no fuera a fallar en el tribunal, lo mejor era conseguir declaraciones hasta de aquellos que dijesen que no vieron nada. El propósito era localizar a toda persona que pudiera ser testigo, aunque fuera a declarar que no vio nada; y la única forma que yo veía que se podía hacer era recurriendo a esas personas, y así hicimos, y lo más fácil era a través de la Unión, porque toda su vida giraba alrededor de ese local de la Unión. Era el club social, la fuente de sus ingresos, y venían personas con intereses similares a sus amigos. Ahora, hay otra cosa. Aunque pudiera localizar todos los miembros de una ganga por nom-

bres y direcciones, si yo mandaba a buscar a esos obreros a mi oficina, no diría todos, pero la mayoría venía con el cuento 'Hay bendito licenciado, he perdido un turno de trabajo para venir acá.' Yo le decía: por qué no vinieron otro día cuando no tenían trabajo. 'A mi no me lo dijeron.' Lo que quería decir que ellos esperaban que yo le 'resarcía' el turno de trabajo por venir a dar una declaración. Todo eso yo podía evitar a pesar de que los gastos de viaje yo siempre se los pagaba. Todo eso yo evitaba yendo a la Unión y cogiendo las declaraciones ahí, porque si yo le veía allí, pues no estaba trabajando. Además, si él estaba trabajando ese día, yo podía, perdón, posponer la toma de declaración hasta otro día y podía averiguar qué día estaba libre para cogerle la declaración en horas libres evitándole problemas, y así lo hacía. A principio yo iba casi siempre, yo personalmente, acompañado de Edgar Irizarry, y a veces no acompañado de Edgar Irizarry, dependiendo de si iba en avión o en el carro de él. Por ejemplo, cuando queríamos investigar cierto caso, lo que hacíamos era reunir casos hasta que teníamos 5 ó 6 casos para investigación en Mayagüez. Ya eso, valía la pena dar un viaje alguien en la oficina para coger las declaraciones. Muchas veces yo llamaba a la Unión, al Presidente, o cualquiera persona de contacto en la Unión y le decía: deseamos ver los testigos de los siguientes casos; el viernes vamos a ver si vamos. Ellos ponían eso en la pizarra y eso nos ayudaba grandemente, porque aún aquel testigo que no sabíamos, si veía eso decía: 'Fulano de tal, yo trabajaba con él aquel día' y se presentaba ahí. Era una forma de localizar los testigos y una economía. Después de trabajar algún tiempo, me llamaban de la Unión: 'Licenciado, aquí está fulano de tal. Sufrió un accidente y él quiere hablar con usted.' Yo le decía: dígale que yo pienso estar allá en tal fecha; que me encuentre en la Unión. Yo iba y pasaba allá todo el día. No tenía que dar vueltas. Esa era una forma de operar que conocían todos ellos y yo también; y conseguía la cooperación de la Unión, porque, si por ejemplo, yo quería ver a un obrero en particular, yo decía al Presidente, o quien fuera, quiero ver a fulano de tal. El llamaba a uno cualquiera que estuviera allí: 'Vete a buscarme a fulano de tal.' Para mi representaba una economía de tiempo y no había otra forma de trabajar. No sé si le he contestado, pero he tratado de darle un cuadro de como funcionábamos.

Iban en ocasiones los dos miembros del bufete, usted y el compañero Nachman?

Casi nunca, porque hay que recordar que Harvey llegó a Puerto Rico en 1958, y no hablaba el español; y hasta hoy día lo habla bastante malo; esto yo no se lo digo, pero lo machuca. Sí, Harvey fue 2 ó 3 ocasiones conmigo, pero era más para presentarlo a las personas. El no podía coger una declaración porque no sabía el español, y los obreros no sabían el inglés. A veces iba a ver la escena del caso. Recuerdo el caso de Federico Marín Gutiérrez de Ponce, que fue hasta el Tribunal Supremo de Estados Unidos y lo ganamos. En ese caso, como queríamos ver el sitio donde se había lesionado Federico, ver la situación del barco para tener en mente un cuadro y saber lo que alegábamos nosotros, recuerdo que fuímos él y yo; y hay otras ocasiones.

En ocasiones iban solos los señores Dapena y Edgar Irizarry?

Sí. Definitivamente. Por ejemplo cuando si iba a . . . cómo lo digo? . . . si habían 5 ó 6 casos, ellos iban solos. De hecho, hicimos una división. Dapena es de Ponce. Está relacionado con los Dapena de Ponce. El tenía a Ponce como su área, y Edgar Irizarry a Mayagüez, porque nació me parece que en Cabo Rojo.

La paga de los honorarios de estos casos en que ustedes representaban a trabajadores, en qué forma era pagada por los trabajadores?

Siempre a base de una tercera parte. Desde principio establecimos eso. En ningún caso cobraríamos menos de eso. En algunos casos, cuando debido al desorrollo del caso no era posible transigir el mismo porque nosotros estimábamos valía más, estoy seguro que el compañero sabe, el mismo abogado del demandado está engañado, y no fue hasta que se investiga completo que se da cuenta, pues por ejemplo, si había una lesión no seria, pero debido a la cuestión de responsabilidad no se podía entregar al obrero menos de tres o cuatro mil dólares, entonces acreditábamos los honorarios. O sea, aceptábamos menos de la tercera parte para darle más a ellos. Quiero hacer constar, que en cada uno de estos casos, esto tengo que agradecer a Golenbock, porque fue él quien me enseñó ésto: al hacer las distribuciones, jamás se cambió un cheque ni se entregó cheque al cliente. Lo que hacíamos era recibir el cheque; depositarlo en la cuenta nuestra; y en el mismo acto devolvíamos el resto. Es lo que llamábamos distribución final. Decía arriba; 'Tanto recibido en trans-

acción o sentencia.' Entonces abajo decía: 'Deducción honorarios, tanto; tanto examen del doctor; fulano de tal tanto; deposición tanto,' porque en todos los casos tomábamos deposiciones. En casi todas las demandas el bufete de ellos es casi siempre el bufete de Hartzell, Fernández y Novas. Se hacía constar el total de las deducciones, y entonces dice: 'Neto pagado a usted por nuestro cheque número tal de tal fecha', y cuya distribución firmaba uno de los abogados de la oficina. Junto con el cheque en liquidación del caso, se entregaba el original de esa distribución final al cliente, y el cliente firmaba la copia que se quedaba en el expediente y que decía: 'Recibido conforme,' y él firma ahí. Así, en cada caso hay una distribución completa en el expediente de la oficina y también en manos del cliente.

No se le exigía al cliente anticipo inicial cuando entregaba el caso a la oficina?

Colega, usted conoce a los estibadores puertorriqueños? Yo tenía, por ejemplo, una serie de preguntas en los 'fact sheets'. Eso también hacían los muchachos. Cuando cogía un 'fact sheet', una persona se presentaba en la oficina; yo le decía, por estar ocupado, cógele el 'fact sheet'; eran los datos personales; su versión cómo paso el accidente; y entonces en el 'fact sheet' la historia personal del hombre. Yo pregunté a uno de Cataño, me parece, casado o soltero? 'Soltero con obligación' y yo no sabía qué quería decir con eso. Me explicó que era soltero, pero tenía 13 hijos en 4 mujeres. Sencillamente estos obreros no tenían con que pagar. Vivían de un turno a otro turno. Tan es así, que si yo citaba a uno de la isla para venir a San Juan, muchas veces me exigían que le pagara los gastos del viaje antes de él venir, porque no tenía con que venir. O sea, ellos me exigían que pagara por adelantado.

Llegaron ustedes en alguna ocasión a estar conscientes que hubiesen logrado un control en cuanto a este tipo de accidentes de trabajadores de muelles por el bufete de ustedes?

Francamente no entiendo la pregunta. Ahora, si usted me pregunta si yo sabía que las personas hablaban que nosotros llevábamos casos de los muelles, seguro colega, porque muchas veces entraban personas a la oficina y decían: 'Yo quiero ver a los americanos', o 'quiero ver al abogado americano', y por cierto que parezco yo más latino que americano. En más de un caso no creían que yo era la persona que ellos querían hablarle;

y quien es buen testigo de eso es mi secretaria, que ha estado conmigo bastante tiempo en esa oficina. Ella entró en marzo de 1956.

En todas esas ocasiones en que ustedes iban directamente a los locales de la Unión, y que iban las personas empleadas por ustedes, sabe de algún otro bufete que estubiera haciendo gestiones parecidas en esos locales?

Sí señor. Pero lo que pasó es . . . yo no sabía que hacían gestiones en los mismos locales. Quiero decir que sabía de otros abogados que tenían casos de esta naturaleza, casos marítimos. Lo sabía personalmente porque me referían casos de esta naturaleza. Me han referido casos Arturo Ortiz Toro, Manuel Abreu Castillo, Antonio Amadeo, César Andreu Ribas, William Morales Torres. Algunos más: Gerardo Ortiz del Rivero, René Benítez; ese fue un caso de un marinero que me parece perdió la vida cerca de la Costa de Ecuador, Perú. Han habido más.

Ustedes se encontraban allí con otros abogados?

No.

Usted conoce a Félix Martínez?

Sí.

Hubo alguna relación con él cuando ustedes hacían estas gestiones?

Sí. La relación que yo tenía con Félix Martínez, antes de conocer a Félix, cuando yo empecé a visitar a Ponce, tenían como secretario-tesorero de la Unión, me parece que es Isidoro Rodríguez. Yo lo conozco por Lolo, pero me parece que su verdadero nombre es Isidoro Rodríguez. El era secretario-tesorero. Entonces, Pedro Rosa muy raras veces estaba en el local de la Unión cuando yo iba. Me parece que fue Lolo quien me ayudaba cuando yo iba a Ponce. Lo llamaba: Lolo, voy el viernes . . . favor de reunirme las siguientes personas, o avisaba que me encontraran ahí. En otras ocasiones, por ejemplo, todos los viernes, casi todos los viernes, señalábamos para las deposiciones de 2 ó 3 casos. Harvey quería tomar las declaraciones, y naturalmente yo tenía que asistir y servía de traductor en la deposición. Cuando había que traer dos o tres de Ponce, muchas veces yo llamaba y decía a Lolo, Lolo favor de traerme a fulano de tal y fulano de tal el viernes. A principio yo le decía que los mandara. Se le pagaban los gastos y se cargaban al caso. Lolo luego dijo que tenía un carro y le interesaba ganarse unos chavitos extras, y que si los podía traer; y así se hizo. Yo le pagaba a Lolo. Me daba la

ventaja de seguridad, porque el mayor problema lo era la falta de comparecencia de estos obreros. Se hacía una cita con un médico y el médico lo está esperando, y no aparece el obrero. Se llama al notario y taquígrafo y el testigo no se aparece. Es tiempo perdido y se creaba fricción con los otros abogados; y así, teniendo una persona responsable, yo tenía la seguridad de que iban a llegar. Lolo fue primero; y cuando Lolo salió como secretario-tesorero, entró Félix Martínez y entonces Félix hacía lo mismo.

Este señor Martínez acompañaba también a los trabajadores aquí a San Juan?

Sí.

Tenía automóvil?

Tenía un . . . si mal no recuerdo fue un viejo 'Ford'. También hacía otra cosa. Cuando yo iba en avión, Félix me recogía en el aeropuerto y me llevaba a la Unión y en cualquier otra diligencia, y me llevaba otra vez al aeropuerto."

## 6. (Subprocurador General)

"Yo no tengo más preguntas. Si usted tiene alguna cosa que añadir, puede hacerlo.

Sí, yo quiero añadir algo, colega. En primer lugar, me parece que el colega debe saber lo que promovió esta investigación, o mejor dicho, lo que promovió la queja que dió lugar a esta investigación. Allá para 1964 ó 1965, Gerardo Ortiz del Rivero refirió a la oficina nuestra un caso de una viuda de Cataño, cuyo esposo es veterano mentalmente incapacitado y recluído en la Clínica Juliá, bajo auspicios de la Administración de Veteranos. Fue a su casa con una licencia, o pase, para pasar el fin de semana. Según la versión que nos dieron, después del fin de semana, él en lugar de reportarse a la Clínica Juliá, se reportó a la Administración de Veteranos, entre paréntesis, déjeme decirle que estoy hablando de un caso subjudice, pero presumo que ésto será confidencial, y no se tomará como falta el hablar de este caso subjudice, cierra el paréntesis; cuando este veterano se reportó a la Administración de Veteranos, según nuestra información, fue con el propósito de conseguir que lo trataran como paciente ambulatorio para que se le permitiera a él hacer cualquier 'chiripa' para ayudar a su familia. Le informaron que no le podían dar de alta hasta dentro de 30 días, que un médico lo autorizara, pero lo iban a dejar en licen-

cia y le entregaron un frasco de las píldoras que estaba tomando, que representaba el suministro de píldoras para un período de 30 días. Es percebible, compañero, murió ese día de haber ingerido esas píldoras. Al recibir este caso, como hacemos en todos los casos, después de hablar con la cliente y ella venir a la oficina, pues radicamos la demanda correspondiente. Lo que le relato ahora, es prueba de referencia, porque fue con mi socio Harvey que pasó lo que le relato. La viuda llamó a la oficina muy excitada para informar que había un llamado investigador en la casa de ella. No sé lo que le dijo, pero ella estaba bajo la impresión que la había amenazado con quitarle la pensión porque estaba demandando al mismo gobierno que le estaba pasando esa pensión. Mi socio Harvey llamó a Paquín Gil y le dijo: 'Mira Paquí, tú eres abogado de un litigante, más nada. Porque en un caso civil tú eres un abogado más, tu cliente es sólo un litigante y tú tienes que dejar a mi cliente en paz y comunicarte con ella a través de la oficina mía.' Paquín Gil dijo que no era política de él intervenir en los asuntos interagenciales, si se puede llamar así (Interrupción)

Ese Paquín Gil es el Fiscal Francisco (Interrupción)

Francisco Gil, el Fiscal Federal. El dijo que no iba a interferir con eso. Que no tenía autoridad con eso. Harvey le dijo: 'Tú eres el abogado de los Estados Unidos de América en este caso, y cualquier acto de cualquier agente de los Estados Unidos de América tiene que estar sujeto al control tuyo'. Harvey también le advirtió que si pasaba otra vez, iba a recurrir al Tribunal pidiendo protección para nuestra cliente. A las pocas semanas pasó otra vez. Harvey preparó una moción para radicar en el Tribunal Federal alegando que ellos, yo no sé si él alegó violación de los cánones de ética, me parece que sí, al comunicarse con nuestro cliente, y pidiendo protección del tribunal para nuestro cliente. Por cierto, cuando leí la moción le dije a Harvey, la palabrería es fuerte. Pero Harvey estaba molesto con el Fiscal Gil. El exigía en la moción medidas para proteger nuestro cliente. Además, ya venía arrastrándose cierta fricción entre nosotros y el Fiscal Gil. Tuvimos un caso contra la Marina en que hicimos un descubrimiento de documentos, y nadie de esa oficina se presentó para la inspección de esos documentos. Fueron sorprendidos durante el juicio, cuando pudimos establecer nuestra teoría con los documentos de ellos. Fue un caso de Vieques que nos refirió Germán Rieckehof, donde un

chofer de carro público perdió el brazo con un camión de la Marina. La investigación nuestra desplegaba que los dos marinos en la cabina de ese camión, tenían una muchacha del pueblo en el camión en el momento del accidente, pero esa muchacha era casada con un puertorriqueño que estaba en la Marina, pero fuera de la isla, en Estados Unidos, y ella no quería que saliera a relucir que estaba allí con dos marinos norteamericanos teniendo el esposo por allá. Pero ella había dicho a otro testigo que cuando ellos pasaban la curva de la carretera en Vieques, al ver el chofer del camión de la Marina la luz del carro público que venía en dirección opuesta, le puso la mano encima de la cabeza y la metió debajo del 'dash' y parece que ese movimiento causó que perdiera el control del camión y raspara el lado del carro público llevándose el brazo de este muchacho que tenía el brazo recostado de la ventana abierta. En ese caso el Fiscal Federal citó a los testigos con citaciones oficiales entregadas por un alguacil de los Estados Unidos para que los testigos vinieran aquí a la oficina del Fiscal en el Edificio Federal para dar sus declaraciones ex-parte. Esa muchacha estuvo aquí en este edificio, pero no se le tomó declaración a ella. Ahora bien, creímos nosotros que esto era criticable porque la función de un abogado que ocupa un puesto público, nos parece, su función y su deber va un poco más allá del deber de un abogado que representa un litigante privado. Nosotros sabemos de eso; y cuando ocurrió este otro incidente, creímos que era tiempo de parar esa práctica. Lo discutimos ampliamente el socio mio y yo. Era nuestra opinión, que si querían tomar declaraciones de los testigos, que debían ir a donde ellos a tomar las declaraciones, como teníamos que hacer nosotros. Citarlos para deposiciones era. . . . Nosotros creímos que los fiscales no tenían el poder de citación oficial en un caso civil. De hecho, fuimos informados, y no recuerdo quien nos dijo, que era una Regla o lo que se podría llamar promulgación del Secretario de Justicia de los Estados Unidos, precisamente, de no usar las citaciones en casos civiles en la etapa investigativa. Pues teniendo esta situación, y los rencores, tengo que admitir que desgraciadamente, como decimos vulgarmente, no tengo pelos en la lengua, cuando una persona me preguntó, una persona allegada a mi y allegada al Fiscal Gil, qué creía yo del Fiscal Gil para candidato a Juez Federal, yo expresé mi opinión; que era completamente inapto. Un error de política, error de tacto, pero una opinión honesta.

Yo sé que eso llegó al Fiscal Gil, porque no fue mucho después de eso que dejó de hablarme y dejó de saludarme. Cuando radicamos esa moción el socio mío, Harvey, lo argumentó. Yo no estaba ahí. Después de una o dos suspensiones, el Tribunal le dijo al Fiscal Gil que no podía seguir con eso y tuvo que dejar de tocar a nuestro cliente en este caso. Que ordenara a la Administración de Veteranos, o quien fuera, que dejara de visitar nuestro cliente. No era un caso criminal. No tenían el poder de investigar en esa forma. Cuando Harvey llegó a la oficina después de esa vista me dijo que uno de ellos, Gil o Gierbolini, dijo algo en el pasillo, algo, y no digo las palabras exactas porque no las recuerdo. Dijo algo de desquitarse con nosotros. Fue poco después de eso que yo oí, y no sé quien me dijo, sí sé, que uno de los fiscales, y no sé cuál, dijo a Adonis Nieves, que trabajaba con nosotros; y que sigue siendo mi amigo, me dijo Adonis que nos estaban investigando y que tenían evidencia y que tenían un buen caso contra nosotros. Yo no le presté atención porque creía que era palabrería. Esa es una de las cosas que quiero aclarar. La otra cosa que quiero aclarar es que estoy siendo víctima de extorsión ahora por Edgar Irizarry. Perdóneme por levantarme, pero estoy emocionado. Está envuelta la vida mía y de (Interrupción)

No se preocupe.

Está envuelta la vida de mi esposa y de mis hijos. Cuando vino a trabajar conmigo, a él le pagaba Golenbock. Los cheques de él venían de Nueva York, como venía el de la secretaria y el mío. Yo tenía, supuestamente, $250. mensuales para sostener la oficina en una cuenta acá. En muchos meses no llegaban esos cheques. A fin de mes yo tenía que enviar a Nueva York todos los talonarios, talones, de los cheques, el estado de cuenta bancario, y los cheques, y eso se enviaba a Nueva York. Fondo del Seguro, todo se pagaba de Nueva York. Cuando Eddie vino a trabajar conmigo, nos hicimos amigos íntimos, al extremo que me invitó a ser padrino de su segunda boda. Hay que aclararlo porque tengo entendido que ya van cuatro. Tuvo que pedir permiso especial del cura para que un judío pudiera ser su padrino, padrino en una iglesia católica. La amistad nuestra fue mucho mas allá de cualquier relación de compañeros de trabajo. Socialmente salíamos juntos y éramos amigos. El conocía a toda mi familia y yo la de él. Nos visitábamos mutuamente. Yo fuí a veces consejero de él y su segunda esposa, Hilda, cuando tenían

disgustos. Yo trataba de apaciguar porque él siempre ha sido una persona de temperamento violento y yo trataba de apaciguar las cosas; Hilda, la segunda esposa, es testigo de eso. Allá para 1961, a fines de 1961, Eddie vino donde mi y me dijo: 'Stanley yo voy a renunciar. Me voy a unir a una compañía, una fábrica de velas en Cataño con dos españoles, y creo que me va a ir mucho mejor que aquí.' ¿Quién se iba a oponer? Aquí cada uno tiene que buscar su progreso. Además, él siempre había sido hombre de negocios. Durante el tiempo que trabajó conmigo, su padre siempre tuvo una fuente de soda en Cataño, en Bay View, pero Eddie manejaba el negocio, porque el padre siempre estaba enfermo. Más tarde cogió el puesto de gasolina que estaba al lado del negocio, me parece que una estación de Shell. En ocasiones se me desaparecía por espacio de 3 y 4 horas, porque estaba esperando la entrega de gasolina. A veces yo lo regañaba porque yo creía que no era justo. Una vez se metió en el barrio Caimito en crianza de cerdos. Cuando me dijo que iba a renunciar yo dije: buena suerte. Nos separamos; y si mal no recuerdo, a pesar de que estaba renunciando, yo le dí un bono. Si mal no recuerdo, eso fue así. Todos los empleados han recibido un bono en navidades, y no siempre el mismo bono; porque, francamente, si lo voy a dar siempre al erario público, pues lo doy a aquellos que me han ayudado a ganarlo, y no creo que eso es malo. Eddie se fue. Al poco tiempo vino a donde mi y me dijo: 'Stanley, tienes que salvarme porque los diez mil dólares que metí en esa fábrica se han perdido y ahora esos dos españoles me están exigiendo otros diez mil dólares para salvar los primeros diez mil.' A propósito, los primeros diez mil fueron de la primera esposa porque se divorció de la segunda para recasarse con la primera. Yo fuí un sábado o un domingo a la fábrica de Cataño. Fuí acompañado de mi esposa y mis dos hijos. Ví la fábrica. Hablé con los dos españoles, o venezolanos, porque en Venezuela, especialmente bajo el régimen de Batista no . . . cuando el dictador Marcos Pérez Jiménez, que tuvieron que salir de allí a pesar de que eran personas muy ricas allí. Cuando yo ví la fábrica, y les pedí los estados financieros del negocio, me entregaron un estado que decía que tenían $400,000. en maquinaria. Yo le dije: Edgar, tú eres un tonto. Aquí no hay $400,000. en maquinaria; aquí no hay $40,000.; dudo que hayan $4,000. Para ti yo trabajo gratis en cualquier momento, pero yo no le debo nada a estos españoles

para a ellos trabajarle gratis. Yo te hago un favor en no meterme en ésto, y te digo que te salgas de ésto. Sorpresa que me dió: lo que Eddie esperaba era hacerme socio y que yo invirtiera $10,000. en el negocio. Yo le dije terminantemente que no. Poco después de eso vino a la oficina. Entró tirando puertas, gritando, usando palabras sucias en plena oficina. De lo que se trataba era que reclamaba horas extras que había trabajado a través de los años que estuvo en la oficina. Yo no sabía cuánto pedía. Jamás me había hecho una reclamación. Cuando renunció no me dijo nada; y yo creía que era injusto de parte de él, después de perder su dinero en un negocio, tratar de sacarme la pérdida a mi, y así es que yo lo veía. Como él no se calmaba y estaba gritando en la oficina, yo salí de mi oficina para hablar con él; y no recuerdo cómo fué, sí recuerdo que yo tenía mis espejuelos, porque uso espejuelos, y al salir de mi oficina, sé que Miguel Matos estaba tratando de tranquilizarlo y tratando de sacarlo de la oficina diciéndole: 'Si tienes una reclamación, vete al Departamento del Trabajo, pero no vengas a formar un escándalo aquí.' Al salir de la oficina, me iba a quitar los espejuelos para hablar con Eddie, pero él no me dió tiempo de quitarme los espejuelos. Me dijo: 'No te quites tus espejuelos', a mi; y con eso me dió un puñetazo y me tiró contra la pared, porque Eddie es más grande que yo y pesa más. En eso intervino Miguel Matos, y por fín, en alguna forma lo sacó de la oficina. No me recuerdo bien lo que pasó en ese incidente porque yo estaba aturdido. Entonces empecé yo a recibir cartas del Departamento del Trabajo de que Edgar Irizarry había radicado una reclamación de horas y salarios. Yo hubiese ido a las vistas administrativas, pero había ido a algunas como abogado, y siempre tenían el reclamante allí; y francamente yo quería esquivar un encuentro personal con él. En eso yo consulté al que yo consideraba un buen abogado en la materia, que era Ramos Vargas, socio de Rieckehof, y le pedí que me representara en ese caso. Me aconsejó que no hiciera nada, y no iba a las vistas administrativas porque de esas vistas nunca salía nada. Que esperara que se radicara la demanda y él asumiría entonces mi defensa. Yo creía que si Eddie tenía alguna reclamación contra mí, era desde 1961, enero 1ro, cuando la oficina llegó a ser mía. Si tenía reclamación anterior a esa fecha, tocaba a Golenbock, porque yo no era el patrono; yo era co-empleado con él; y además, no trataba de centavitos, sino de nueve mil y pico de dólares. Se

siguieron recibiendo las cartas del Departamento del Trabajo, pero nunca demanda. Yo me olvidé del asunto. Cada vez que recibía una carta yo la mandaba a Ramón Vargas mi abogado. Ahí se quedó. Después de esta queja yo no me recuerdo si, sí me recuerdo, yo estaba tratando de localizar a Pepín Rodríguez, porque Pepín me debía dinero. Yo le presté dinero para ayudarlo. Cuando él trabajaba en mi oficina, él dió, yo presumo que lo que yo divulgue en esta oficina de otra persona, no se va a usar en contra de esa persona (Interrupción)

Es confidencial.

Pepín Rodríguez compró una casa allá para 1957 o 1958 y dió un cheque de $800. de pronto pago y el cheque no tenía fondos. Yo no sé si lo llamaron de Fiscalía, o la persona a quien le entregó el cheque, pero le dieron un término de 24 horas para aparecer con los $800, o iban a tomar acción. Resulta que precisamente en esos momentos Golenbock estaba aquí en Puerto Rico y yo pedí a Golenbock permiso para prestar a Pepín ese dinero. Golenbock me denegó el permiso. Yo por mi propia cuenta le dí un cheque de la oficina y yo repuse los $800.; y Pepín sin exigencia mía, fue donde Alberto Picó con su esposa y preparó una hipoteca voluntaria y un pagaré a favor mío por esa suma de dinero. Nunca me lo pagó. Le ejecutaron la casa. La hipoteca mía era tercera hipoteca y no me tocó nada. Hasta el año pasado me parecía que el término para reclamar una deuda, a pesar de que estaba en hipoteca, era de seis años. Yo creía que no valía ya la hipoteca. Por pura casualidad me encontré a Pepín en la calle y le recordé del asunto y me dió un teléfono y una dirección donde supuestamente podía comunicarme con él. Resultó que, no sé porque, no estaba en ninguno de los dos sitios. Preparé mi demanda y radiqué mi demanda y empecé a buscarlo para emplazarlo. Por fin lo localizamos. Entonces me vino a ver y me dijo: 'Stanley, me ha ido mal. Estoy haciendo cobros para ganarme la vida. Ahora, si yo saco algo te pago, pero dame los cobros de tus clientes. Además, si me puedes encontrar un empleo mejor todavía.' Yo quiero a Pepín porque yo creo que a pesar de su inaptitud financiera es buena persona y efectivamente yo traté de referirle sentencias no cobrables, varias de las cuales tengo, cuentas a cobrar; no de mis clientes que me debían, sino casos que los clientes referían para cobrar. Esto y tratando de ayudarlo. Todavía no me ha pagado Pepín. Pero Pepín me hizo el relato de que había encontrado a Edgar

Irizarry y hablando con Edgar, se había enterado de que Edgar había dado una declaración al Fiscal Federal y que había una investigación. Lo que él habló con Irizarry yo no sé. Yo sí sé que en esos días Pepín me visitó y me dijo que Edgar Irizarry le había dicho a él que si Harvey y yo le dábamos dos mil dólares, él no firmaba declaración; él no iba a declarar; él iba a retirar lo que había dicho. Le dije a Pepín: crímenes no voy a cometer y eso es un crimen, y yo no voy a permitir extorsión. Porque si le doy dos mil dólares, ese es el principio, no el final, y entonces sí él va a tener una arma y Edgar puede decir lo que a él le dé la gana. Habrá quien tendrá que juzgar. Pepín entonces me dijo que Edgar había dado una declaración y ésto fue lo que Eddie declaró o relató a Pepín. En parte dijo que alguien le había prometido a él unos honorarios, lo cual yo nunca hice; que él no iba a declarar quien le había hecho la oferta. Que si nosotros le dábamos dos mil dólares, él iba a decir que era Golenbock; si no le dábamos los dos mil dólares, iba a decir que éramos nosotros. Inmediatamente yo relaté esto al compañero mío y dos abogados más. Hice que un abogado estuviera presente cuando Pepín me dijo eso. Lo llamé para sentarse para escuchar eso. No le cogí a Pepín declaración jurada escrita. Le he pedido que vaya donde un notario a darla. Otra cosa que quiero aclarar: Usted me pregunta de Félix Martínez. Yo no he visto a Félix Martínez desde 1960, diría yo. Ni él me ha visto a mí. La última vez que lo ví, y lo puedo fijar porque yo he estado en sólo tres oficinas en Puerto Rico, una en Almacenes Marítimos, otra en los altos de la International Harvester en la Parada 2½ en Fernández Juncos, y la tercera oficina es la que ocupo actualmente en el Edificio Ballester, en el local que ocupaba antes el Comité Presidencial del Partido Popular. Puedo fijar cuando fue que yo ví a Félix Martínez la última vez. Entré en Fernández Juncos el 1ro. de agosto de 1961 bajo contrato por cinco años, el cual se venció en julio 31 de 1966. Félix Martínez nunca estuvo en esa oficina de Fernández Juncos. La última vez que lo ví a él fue en Almacenes Marítimos, la oficina original. El vino a esa oficina un día y me dijo que un abogado, no de esta jurisdicción, de afuera, le había ofrecido a él poner una oficina en Ponce y poner, si mal no recuerdo, no a Félix, sino al hijo de él, a cargo de la oficina para todo el trabajo relacionado con todos estos trabajos. Félix me dijo él estaba ofreciéndome la oportunidad de hacerlo con-

migo. Yo le dije: Félix, eso yo no lo puedo hacer ni lo voy a hacer ni tengo la más remota intención de hacerlo. Félix me dijo a mi: 'recuérdese que yo no voy a poder trabajar más con usted y si yo puedo referirle casos al otro abogado, lo voy a hacer.' El era Secretario-tesorero de la Unión. Yo le dije: mala suerte. El se fue; y hasta el día de hoy no lo he vuelto a ver. Por último, le estoy cogiendo mucho tiempo colega, por último deseo aclararle: se ha regado por la calle que yo soy millonario y ésto me ha traído, cómo diría yo, mala fé, comentarios de compañeros y de otras personas. Bendito sea Dios, si yo dejo de trabajar un mes, mi familia no tiene con que comer! Tengo un condominio que compré con mis ahorros de todos los años de trabajo, y lo voy pagando mensualmente. Pagando lo mismo que pagaría en renta en un apartamento de otro. Tengo una parcela de dos cuerdas en El Verde que compré con mi cuñada porque mi suegra siempre ha vivido donde hay flores y eso y quería un sitio para poder ir los fines de semana. Creo que ahora tiene 80 años. Compramos esta parcela y pagamos creo que a tres mil la cuerda, y ahora se construyó una casita de concreto, la cual construí con dinero de la oficina, teniendo yo que pagar $300. mensuales con . . . que me descuentan de mi sueldo. Este año me gasté el lujo de comprarme un 'Buick Wild Cat'. Primera vez que tengo un carro de lujo y lo compré porque era el carro de Toño Lebrón, Contralor de Caribe Motors, y jefe de mi cuñado por veinte y pico de años e íntimo amigo mío y me consiguió el carro en cinco mil dólares. Aparte de 90 acciones de Commonwealth Oil, mil y pico de acciones de Girard Industries que compré, pues porque era abogado de la compañía, y ahora valen dos dólares menos de lo que pagué, y una inversión de diez mil dólares que hice en la compañía que construyó el edificio donde tengo el condominio, cuya inversión está también perdida ahora; aparte de eso tengo mi balance de aproximadamente dos mil dólares en el banco, y fuera de eso, ofrezco al Procurador General y al Tribunal Supremo para investigación todos mis libros y mis planillas de contribución sobre ingresos, todos mis récords personales desde que llegué a Puerto Rico, y todo lo que tengo en este mundo para combatir la idea de que yo soy una persona egoista, que ha tratado de lucrarse indebidamente de la profesión. De 20 a 30% del trabajo de mi oficina ha sido gratuito. Hasta hoy se puede preguntar, no sólo a don Clemente Ruiz Nazario, sino a Cancio, quien lleva los casos

de Seguro Social en el Tribunal Federal. Hago este trabajo gratuito. De hecho, el tribunal nos asigna esos casos. Me parece que en los primeros dos o tres años de mi ejercicio ante la Comisión Industrial, renuncié mis honorarios en todos los casos. Le voy a decir por qué. Era un abogado extranjero y desconocido. Estos obreros venían donde mi. Muchos de ellos no tenían ningún derecho a ningún caso. Hombre, yo no quería rechazar a esos obreros y no ofrecerle ningún servicio, cerrándole las puertas, porque yo creía que cada uno de esos obreros al hablar con sus compañeros, con sus amigos que tuvieran dificultades de la misma naturaleza, iban a pensar en mi. Si eso es malo yo no comprendo por qué. El único anuncio de un abogado es un cliente satisfecho y eso yo trataba de producir. Los representaba en la Comisión Industrial, y cuando la Comisión aumentaba la incapacidad, lo cual me daba derecho a honorarios, yo decía a la Comisión: renuncio a mi derecho, renuncio para que se pague la suma completa al obrero. Raquel Nigaglioni es testigo de eso. Ella me ha conocido y me ha visto allí a través de todos estos años. Si yo fuera a solicitar casos, presumo que sería con el deseo de enriquecerme, no para trabajar durante meses sin pago. Cómo llegaban tantos obreros a mí? los compañeros. No puedo evitar esa situación, porque cuando caía un caso marítimo, mandaban el caso a mi oficina, y aceptaban su participación, lo que llamo yo 'refer fee', lo cual yo considero correcto, porque son abogados. Yo no he pagado a nadie por referirme casos, si eso es lo que se alega. Tampoco he ido buscando casos. No he tenido la necesidad, gracias a Dios. Cuando esa noticia se regó, cuando se ganó el primer caso, era imposible evitar que los obreros se metieran a la oficina. Habían hasta filas allí, y lo único que podía hacer era, yo coger el 'fact sheet' y no le decía si lo iba a representar o no. Déjeme explicarle algo que creo usted no sabe. En junio o julio de 1956 se resolvió el caso de Guerrido v. Alcoa, que estableció que este tipo de acción se podía llevar en Puerto Rico, porque desde 1924, el caso de Lastra, no se había llevado ningún caso. Creo que en el caso de Guerrido yo no tomé participación. Se resolvió en el Tribunal del Circuito unos meses después de yo entrar. Yo ni sabía que existía tal caso. Entonces, cuando los obreros comenzaron a venir a la oficina: 'Ah, licenciado, tengo yo derecho al Seguro Federal?' Algunos tenían casos hasta de 3, 4, 5 años de ocurridos. No se recordaban las fechas, ni se recordaban el

barco, ni se recordaban los testigos, pero la evidencia del accidente la llevaban encima, sus incapacidades. Uno de Río Piedras, que había perdido un ojo. No recuerdo muy bien, pero me asustaba, porque un día tranquilamente me dijo que había pasado tiempo en presidio por haber matado a otro, me parece que fue al Alcalde de Río Piedras, o de Arroyo, que me dijo que había salido del presidio después de haber servido cinco años por asesinato. Cuando llegaban estos casos, yo escribía a Golenbock y yo le preguntaba si estos casos tenían posibilidad, o si debía rechazarlos de plano y él me dijo que radicando los casos en almirantazgo en lugar de como casos civiles, aplicaba la doctrina de 'laches' o incurria, y en el estatuto de prescripción, y para defenderse, los demandados tenían que probar no solo que había transcurrido el término prescriptivo, sino que había recibido perjuicio como resultado de la tardanza en radicar. Esto abría las puertas a los casos que parecían estar ya prescritos; y cuando también ese noticia se regó entre los obteros [*sic*], y se regó fácilmente porque están siempre juntos, y cada uno es más abogado que el otro, tan pronto uno dijo: 'yo cobré en mi caso y tenía cuatro años', el otro que tenía un caso de tres años, pues venía también. En un caso presentamos en el Tribunal todos los miembros de la ganga de obreros que habían trabajado el día del accidente y toda la historia médica del Fondo del Seguro del Estado; y alegamos al tribunal que no había perjuicio, porque teníamos todos los testigos en el tribunal y el demandado estaba en la misma posición de defenderse como al otro día del accidente y ganamos un caso aparentemente perdido. Como ese, venían muchos obreros a la oficina. Yo les cogía la información que me podía suplir, que muchas veces era muy poca, e iba yo, o iba uno de los muchachos al Fondo del Seguro del Estado, que era la fuente de la información, porque había un informe patronal dando fecha, barco, testigos. Esto me recuerda de otra cosa que también pasó. No sé si fue Donald Dexter, o si fue Atiles Moreu, que me dijo un día: 'ustedes vienen aquí a examinar los expedientes, pero ustedes no tienen autorización escrita de sus clientes; y nosotros estamos confiando en las palabras suyas sin tener autorización escrita." Entonces nosotros preparamos un contrato escrito que dice: 'Contrato de servicio profesional. Por la presente autorizamos al bufete de fulano de tal y fulano de tal,' etc. etc. y eso usábamos en el expediente nuestro como contrato de servicio profesional, así como en el

Fondo del Seguro del Estado como autorización para ver el expediente. Más tarde lo cambié, porque ese contrato me daba la tercera parte. Entonces hice dos contratos; uno para el Fondo del Estado y otro para los servicios en los casos civiles. Así fue que creció y logramos muchos casos. Algunos se rechazaban después de investigación. Recuerdo que un pobre viejo que vino, posiblemente para 1958, que había perdido una pierna en 1933. Caso perfecto de irresponsabilidad, pero obviamente, prescrito. Me recuerdo de un viejito de aquí . . . de . . . cómo se llama aquí abajo? . . . La Perla, tenía 80 años de edad y sufrió un accidente en una pierna trabajando y por fin se transigió el caso por $250. No lo haría hoy, porque yo también he aprendido, pero transigí por $250. y no le cobré honorarios. Entonces informó, yo no sé a quien, pero en aquel entonces en la silla suya estaba William Fred Santiago, y Fred Santiago me llamó, que había una querella, y yo vine y dí el expediente a William Fred y le dije: si usted puede sacar más dinero de este expediente, yo lo pago. Me llamó días después para devolverme el expediente y me dijo que me olvidara del asunto. Yo no soy ningún americano recién llegado buscando fortuna; y mi esposa es puertorriqueña, y mis hijos son puertorriqueños; y me voy a morir aquí abogado o no abogado, pero me moriré aquí. (El testigo llora) Perdóneme colega.

Yo no tengo nada más (Interrupción)."

### Declaración del Lcdo. Harvey B. Nachman, prestada en 28 de octubre de 1966.

7. Fue admitido a ejercer en Puerto Rico en 1959. En 1958 había sido ya admitido en la Corte Federal. Relató sus actividades en Nueva York como abogado en la oficina de Golenbock, y cómo se originó el caso de *Guerrido* radicado originalmente en Nueva York, y trasladado a Puerto Rico. Tan pronto Boston revocó surgieron inmediatamente 30, 40, 50 muchos más casos en la oficina de Puerto Rico. Golenbock pidió al Lcdo. César Andreu Ribas tratar los casos aquí y éste le dijo que él no sabía de este campo. Golenbock abrió oficina con Delgado González, pero él tampoco sabía. El declarante entonces le recomendó a Feldstein. En 1958 ya

estaban los primeros casos en el calendario de la Corte federal y el declarante vino a atenderlos, y luego atendió otro calendario en agosto, que Feldstein no podía atender solo. En 1960 él y Feldstein terminaron con Golenbock aquí.

"Cuál es el campo del Derecho que más practica el bufete?

Bueno, originalmente el campo fue casos marítimos, que fue como una herencia de Golenbock. Pero Stanley es . . . ¿cómo se llama? . . . muy hábil, él tiene educación de contable también, y poco a poco, la oficina tiene más asuntos comerciales, corporaciones y litigaciones sobre casos comerciales. Ahora, todavía tenemos muchos casos en el campo marítimo, y además, ahora hay otros abogados en el campo. Originalmente, todos los que tenían casos, como Ortiz Toro, Carmelo Avila, 'mandaron' a nosotros, pero ahora hay muchos que están practicando el mismo campo.

.    .    .    .    .    .    .    .

Cuál era la clase de trabajo que realizaban Rafael Dapena y Edgar Irizarry?

Investigar los casos. Cuando los hombres venían a la oficina, vamos a suponer que un hombre viene y se lesiona aquí en San Juan. En el momento cuando venía por primera vez el accidente ya ha ocurrido quizás seis meses anteriormente, o un año anteriormente, porque los trabajadores usualmente vinieron a nosotros cuando reciben la alta a trabajar del Fondo del Seguro y a veces pasa dos y tres años, y a veces solamente esto es seis meses desde el accidente. El barco ya se fué. Los testigos ellos no saben por nombre, y uno va a preguntar: quién es su testigo? Un estibador va y dice: 'El Sapo', 'Plancha de Zinc', 'El Indio', tenemos que coger toda esa información. Tenemos que buscar quién es 'El Indio'. Tenemos que ir al Fondo porque en el Fondo, en el Informe, están los nombres de los testigos. A veces los que hay no son los informados por ellos. Teníamos que mandar los investigadores en estos casos.

En cuanto a la función de estos investigadores, frente a la alegación que se hace en la queja, de que el bufete hacía solicitudes de casos, qué usted tiene que informar?

Bueno, yo no 'sabe' otros bufetes, solamente el bufete para el cual yo trabajo. (Interrupción)

Me refiero al bufete de Nachman y Feldstein.

No hay bufete más puro que nosotros. Todos los casos venían a la oficina, o por recomendación de uno o de otro abogado. Gracias a Dios nunca teníamos que buscar casos. Si usted va a la oficina lunes por la mañana, quizás pueda ver seis hombres allí pidiendo que nosotros tomemos la representación de sus casos. Yo sé que ésto es una evolución de los casos que teníamos originalmente de Goldenbock. Además, el trabajo que Stanley hizo para estos hombres en la Comisión Industrial, porque originalmente nosotros no cobrábamos ni un centavo de honorarios en la Comisión Industrial. Stanley siempre renunció sus honorarios allí, y además, y además, recibimos, 'en correo' casos. Yo no conozco a ningún otro bufete aquí en Puerto Rico que 'ha' prestado tantos servicios en Seguro Social, por ejemplo. Yo creo que yo personalmente he visto más casos 'frente' al Seguro Social, sobre los asuntos de Seguro Social, que todos los otros bufetes aquí en Puerto Rico. Yo puedo jurar que no solicitamos ningún caso de ningún tipo; que rechazamos casos con frecuencia, especialmente después de investigados y perder tiempo. No sé si es pertinente, pero 'venía' a nosotros un estibador y dijo que se golpeó en un barco de Waterman y Rafi Dapena fué al Fondo; y cogió el informe del accidente y había dos nombres de testigos; y no pedí a Rafi, por favor toma estas declaraciones, y Rafi me dijo que los testigos no querían dar declaración hasta que el capataz 'va' a dar declaración también. Entonces por fin vinieron los dos testigos y el demandante; y Rafi y yo entrevistamos a ellos, y del contrainterrogatorio encontré que el hombre nunca se lesionó a bordo del barco. Fue trabajando en una finca del mismo capataz. Le dijo que debía reportarse en el trabajo porque no puede ir al Fondo, porque el capataz no tenía en su finca el seguro para el obrero. Yo creo que ese fue trabajo muy bueno de Rafi, porque fíjese la posición que puede un abogado estar, si los testigos y el demandante declaran que el accidente ocurrió en el barco, cuando él nunca estuvo a bordo del barco. La investigación es para proteger igual . . . ellos están alegando cualquier cosa.

Usted recuerda el caso de un trabajador de nombre Alfredo Viana Reyes?

Muy bien.

Me estoy refiriendo a un caso que provocó una vista en la

Corte Federal, durante la cual el trabajador negó que él hubiera autorizado al bufete para representarlo en el caso.

Le voy a decir. Lo que pasó en este caso fue lo siguiente: Había otro caso en la oficina recomendado por una prima de Edgar Irizarry. El tenía una prima que trabajaba, si no me equivoco, para Caribair, y ella recomendó un coempleado y vino a nosotros y este coempleado me parece que su nombre es Morales Figueroa, o algo así (Interrupción)

Figueroa Burgos?

Sí, Figueroa Burgos. El venía a la oficina con un yeso puesto. Yo estaba tomando los datos. El se lesionó a bordo en una escalera que estaba montada detrás de un camión propiedad de International Air Service (Interrupción)

Quién?

Burgos.

El que vino enyesado?

Enyesado. Cuando yo estaba tomando las notas, él dijo a mi que hay testigos que no 'vió' el accidente. Le dije, cómo puede ser testigo que no vió el accidente?, y me dijo: 'fue un hombre que se lesionó a bordo en la misma escalera'; lo que llamamos 'notice witness', y entonces yo pedí a Stanley ir porque Burgos dijo que estaba todavía enyesado, y él se lesionó como tres meses anteriormente en la misma escalera, ir al hospital a tomar declaración de este testigo. El fue allá (Interrupción)

Feldstein?

Feldstein y Burgos y Edgar Irizarry, los tres. Burgos tenía que presentar a Stanley y Stanley no cogió una declaración; tomó notas nada más. El hombre dijo sobre el caso de él y otros casos. Yo le dije, cuando usted salga del hospital puede venir a la oficina. El hombre vino a la oficina; firmó un contrato (Interrupción)

Viana?

Viana Reyes vino a la oficina. Firmó un contrato y abrimos tres casos en uno; uno, estoy casi seguro que fue en el que se lesionó la pierna, no podríamos llevar acción contra el mismo demandado porque él es empleado de International Air Service; teníamos . . . 'estamos' investigando quién fue el fabricante de esa escalera a ver si podíamos llevar un caso de incumplimiento de garantía, pero nunca radicamos esta demanda. Había otro caso. En este otro caso, este hombre se lesionó a bordo de un avión de British West Indies Airways, si no me equivoco, y

el hombre venía a la oficina muchas veces. Yo tenía que mandarlo al doctor y todo. Originalmente Gonzalo Sifre contestó la demanda de parte de British West Indies en este segundo caso y él llevó, Gonzalo, llevó demanda contra International Air Service, el mismo patrono de éste, bajo una póliza de damificación (Interrupción)

Indemnización.

Indemnización, perdóneme. El bufete de Trias y Saldaña representó, en lugar de los abogados que representan en el otro caso de Burgos, porque en Burgos había seguro, pero International Air Service no tenía seguro para el contrato de indemnización. Entonces el caso siguió hasta la semana antes del juicio. En esta semana yo hablé con el otro . . . con el compañero al otro lado, Horacio Subirá. Nos encontramos en el Tribunal Supremo de Puerto Rico, ambos usando la biblioteca allí, y discutimos el caso y llegamos a un acuerdo de cuatro mil pesos para cada uno de los clientes; y él dijo que él creía que era muy razonable y él iba a decirlo a su cliente. Tiene que entender que el cliente de él no tiene seguro. El día antes del juicio este señor me llamó de la oficina de International Air Service y me dijo que él no 'quiere' seguir con el caso. El próximo día, cuando yo 'venía' a corte, todos los abogados estaban allí, porque yo pedí a ellos, a Gonzalo también, a pesar de que ya Trias y Saldaña estaba representando a British West Indies, venir a (Interrupción)

Por esa llamada de Viana él le informó que no quería que lo representara?

Que no quería seguir con el caso. Yo fui a corte y yo llamé a los otros abogados para pedirle que 'vengan' a corte, y yo dije a corte que yo tengo que desestimar el caso, pero yo quiero que la corte investigue la situación. A mi no me importa el caso ni los honorarios, pero yo creía que un accidente que tenía 'derechos civiles', yo tenía impresión sobre que, en español es muy difícil, yo creía que alguien está 'abusando' a este hombre sus derechos civiles. Dije a corte que yo no voy a seguir representando a este señor, pero yo quiero una investigación sobre eso. Yo no recuerdo si el mismo día, o días después, nos reunimos en la cámara de don Clemente. Había allí el Presidente de International Air Service, Viana Reyes, Horacio Subirá, Richard Francis, Sifre, Gil el Fiscal, eh . . . la taquígrafa, y el Juez; y durante la entrevista el Juez encontró que

mi ex-cliente, Viana, estaba diciendo cosas que parecían mentiras, y le advirtió algunas veces al señor durante la entrevista sobre el perjuicio (Interrupción)

Perjurio.

Perjurio, y a fines de la investigación el Juez dijo al Fiscal que él puede investigar en cualquier forma que él 'cree', a ver si alguien cometió un delito sobre los derechos civiles de este hombre. Yo quería avisar por carta al señor Viana Reyes que voy a cerrar, no solamente este caso, sino los tres casos que habían en la oficina sobre accidentes distintos de él. Así fue. Yo no 'oyó' su nombre otra vez hasta ahora.

A qué, si a algo, usted atribuye la conducta de él a pesar de que usted dice que él había firmado un contrato?

El me llamó de la oficina de International Air Service, y estoy seguro que alguien permitió a él trabajar otra vez; y en opinión mía este hombre, no por el accidente sobre el cual estaba en corte, sino por el accidente en la pierna, no servía como empleado físico para nadie. Yo creía que alguien prometió este trabajo solamente para pedir que él . . . que él desestime su caso.

Ante qué persona fue que él firmó el contrato?

Ante mi. En mi oficina. Cuando este hombre venía a la oficina primero, yo no sabía quien es, porque yo no fuí con Burgos a entrevistarlo la primera vez. Yo no lo ví antes de venir a la oficina por primera vez.

Como cuánto tiempo transcurrió desde que él firmó el contrato ante usted hasta que él negó que lo hubiese autorizado para llevar el caso?

Como dos años. Había una investigación tremenda para saber sobre los agentes que vendieron esta escalera y ver si podíamos encontrar los fabricantes de esta escalera. Esta es una escalera especial que está montada y fue un problema otra vez de coger jurisdicción.

En qué etapa se encontraba el caso cuando él retira el mismo?

Ya estaba listo para juicio. Tenía el doctor; tenía los testigos preparados para juicio, porque fue un accidente en que este señor se cayó de un avión y se rompió su boca, algunos dientes; tenía al doctor listo. Yo estaba listo para juicio.

Había tenido alguna entrevista con Viana en la oficina suya?

Por lo menos seis o siete. El único sitio donde yo tenía entre-

vistas con mis clientes, con excepción de algunos casos raros. Cuando yo empecé aquí, yo fuí a Mayagüez y a Ponce quizás dos o tres veces, y yo 'hizo' una investigación por medio de traductores, de Edgar Irizarry o de Stanley, mostrando a los investigadores cómo ellos deben tomar declaración; cómo deben investigar los hechos, y antes de juicios, casi siempre yo voy, si puedo, al sitio a asegurarme como . . . donde fué el accidente y cómo están las condiciones del sitio. Una vez yo 'fué', yo 'fue' con Stanley a Barrio Los Pájaros en Bayamón a ver dos testigos porque tenía un caso con José Novas y el juicio estaba señalado para un día, y dos o tres días estamos discutiendo el caso a ver si podemos llegar a una transacción, y Novas me dijo que si los testigos van a mostrar como ocurrió el accidente, quizás podemos evitar el accidente (Interrupción)

El juicio?

El juicio, perdón. No hay teléfonos allí y fuimos al Barrio Los Pájaros. Fuimos Stanley y yo, y entre Stanley y yo cogimos los testigos para venir al otro día, que por buena suerte Novas estaba, y él fue con los testigos al muelle. Fue un caso contra Bull en el muelle número 9. Un caso raro.

Por cuánto fue la demanda en el caso de Viana?

No recuerdo. Nosotros siempre pusimos cantidades grandes. Si creíamos que el caso no fue 'casi' grande, usualmente nosotros pusimos $25,000. Si el caso tiene mucho valor, nosotros poníamos cincuenta; si el caso es muy grande, y 'pongo' cien o más miles de dólares. Usualmente la cantidad de la demanda es mucho más alta que la que esperamos adquirir en el caso. A veces hay ciertos casos alterados después de la demanda, en los cuales creo que la demanda no es suficiente. Por ejemplo, yo ví un caso en Corte Federal con Rafael González, en el cual la demanda fue por una cantidad de setenta mil y antes del juicio yo creía que esta suma fue muy 'bajo' y que un jurado podría venir con una sentencia mucho más 'alta'. Yo tenía poquito miedo y yo no quiero hacer una moción en corte y enmendar la cantidad porque, especialmente en frente del jurado, parece mal. Obviamente que yo tenía razón originalmente porque el jurado regresó con una sentencia de veintiseis mil dólares.

En ese caso no recuerda si hubo oferta de transacción?

En el de éste?

Sí.

Oferta no hubo, pero hubo un arreglo entre Subirá y 'mi' por cuatro mil dólares. Oferta de transacción implica a mi, que otro abogado ya tiene la autorización y que los casos que yo tengo que son con compañías afuera de Puerto Rico, usualmente el otro abogado no tiene la autorización cuando nosotros estamos discutiendo transacción. Por ejemplo, cuando tengo casos con Toño Bird, a veces llegamos a un acuerdo entre $750, hasta que . . . la cantidad más alta que tengo aquí es ochenta y ocho mil; llegamos a este acuerdo él y yo, pero él tiene que escribir a New York, a Inglaterra, para eso. Lo mismo con Subirá. Si yo tengo casos con el bufete de Rivera Zayas y ellos están representando a Maryland Casualty, que tienen agentes aquí, cuando ellos ofrecen alguna cantidad ya tienen autorización; pero si es Royal Glow, 'o' otra oficina que no tiene oficina aquí, en ese acuerdo tienen que pedir permiso allá. Le dije a Viana que estoy tratando de conseguir una transacción (Interrupción)

Ahora?

No. Antes de llamarse al juicio.

Cuál fue la reacción de él?

Satisfecho y dispuesto a arreglar el caso.

Sin embargo, el día de la vista (Interrupción)

Porque Subirá nunca recibió la autorización y teníamos que ir a juicio, y en este tiempo él fue a International Air Service y allí alguien le dijo algo y él me llamó desde esta oficina y me dijo que no quiere seguir con el caso.

Entonces esta actitud de Viana en el Tribunal fue una completamente distinta con relación a toda la conducta anterior de él? ·

Sí. No solamente eso, él estaba allí en el tribunal muy nervioso, y el juez le advirtió él conteste las preguntas; y yo no hice las preguntas a Viana. Yo pedí en esta investigación, yo mismo, y el Juez concedió la investigación.

Con relación a los puertos de Ponce y Mayagüez, usted fue a los locales de la Unión.

Como ya antes dije, yo fue a ella muy pocas veces. Yo fuí a Mayagüez a investigar el caso, un caso que yo no ví, lo vió Golenbock, 'de' Caballero es el nombre del cliente; y el caso que yo fuí a investigar, también, un caso de Osorio Ríos y yo fuí con Stanley y con Irizarry estas dos veces. A Ponce yo fuí a

investigar el caso de Marín Gutiérrez y algunos otros casos. Yo fuí a Ponce una vez sin Stanley y con Rafael Dapena.

En Ponce, conoció a Félix Martínez?

No Ponce; yo conocí a Félix Martínez en la oficina mía como chofer que llevó clientes para deposición.

El bufete le pagaba a Martínez por ese servicio?

Para qué?

Traer clientes?

Claro.

Se le pagaba a Félix Martínez?

Siempre, igual que a cualquier otro chofer.

Había algún arreglo entre el bufete y él? ¿Se le pagaba por ese servicio?

Por el servicio. El bufete pagó todos los gastos del caso.

Se le hacía un cargo al cliente?

Sí. Se ponía: para deposición, viajes, cualquier cosa. Pero en Ponce yo no recuerdo a Felo Martínez. Las veces que fuí a Ponce, fuí con Rafi; Rafi guiaba su propio carro, y yo no necesitaba carro en Ponce.

A los trabajadores a quienes el bufete le llevaba casos, nunca se le exigía anticipo o cantidad de los honorarios?

No.

Se liquidaba todo al final?

Sí. Estos hombres son personas pobres y nosotros teníamos que invertir en el curso del caso a veces mucho dinero. Por ejemplo, si yo tengo que tomar deposición de una tripulación de un barco, quizás estas deposiciones van a 'gastar' dos cientos dólares. Yo no puedo ir a decir, deme dos cientos dólares al cliente para estas deposiciones; y él va a preguntar, por qué necesitamos estas deposiciones, una cosa 'o' otra. No solamente porque no puedo explicarle, pero porque si yo tengo que hacer eso, yo no tengo que trabajar como abogado de este señor. Ahora mismo yo tengo un caso referido por un abogado de Jacksonville, Florida, en el cual yo tengo que usar expertos en la ciencia atómica y yo no puedo decir a mi cliente, usted tiene que pagar para este experto. Estoy en juicio ahora con un caso del profesor Samuel Polanco; tenía que usar patólogos; tenía que usar ingenieros; tenía que usar profesor de matemáticas, que nunca se usó en el juicio, pero tenía que pagarle para una investigación que confirmó un testigo ocular, y entonces necesitamos el testimonio del perito. Hay algunos que

tengo que mandar un solo cliente a cinco doctores distintos. Por ejemplo, un caso que yo transé con Bird. Un caso viejo de Bull. Hubo tardanza por la quiebra Bull allá en New York. Tenía que mandar al cliente a no menos de seis especialistas; Dr. Rifkinson, Fred, Dr. Payne, a un sicólogo, a un psiquiatra, dos psiquiatras que lo vieron en la Comisión Industrial. Entonces, cada una de esos gastos se pone en el 'docket' sobre este caso y se saca del cheque cuando hay una distribución completa con todo gasto pagado, con el número del cheque y todo. A veces los gastos son solamente $85., y a veces esos gastos son miles de dólares; y el cliente obtiene el original de la distribución final con el cheque. Ha sido así siempre, desde que empezamos. La situación es distinta cuando representamos a una corporación. Por ejemplo, si es una corporación con un litigio de 'antitrust' o una litigación de 'stock and delivery', o un caso bajo la Ley 75 de 1964, en el cual un distribuidor está demandando contra un fabricante que quitó la representación, yo no voy a aceptar este caso bajo una contingencia, pero que si puedo invertir mi tiempo en este asunto, pero corriendo un riesgo. Para una corporación no. Si usted o cualquiera otra persona viene a mi con un caso bajo la Ley 75, yo voy a trabajar, pero le digo que debe poner un adelanto, un acuerdo que va a pagar los honorarios y los gastos, y si los gastos suben, usted tiene que pagar más.

Estos empleados Irizarry y Dapena, llegaron a estar destacados uno en Ponce y otro en Mayagüez?

Nunca.

Quiero decir asignados.

Nunca. Si necesitamos investigaciones, ellos entre sí hicieron unos viajes cuando pudieran haber seis casos 'a vez' o algo así, pero si había un caso señalado para vista y yo quería ir, como por ejemplo en el caso de Marín Gutiérrez, fuimos Rafi y yo a Ponce, pero no había un territorio para uno y un territorio para otro. Yo fuí el que siempre estaba chequeando los expedientes en la oficina, y viendo las fechas de prescripción y 'la' nivel de la investigación y la preparación de juicio, porque un bufete como éste, uno sabe que va a transar ochenta o casi más del porciento de los casos, pero no sabe cuál de estos casos va a caer dentro del porciento que va a transar y que porciento no va a transar. Tenía la filosofía que cada caso debe estar preparado para juicio, porque a último momento el demandado puede

decir que no va a dar autorización—uno es abogado y debe preparar sus casos y yo soy como Napoleón sobre este asunto, pero en mi oficina mis casos están bien preparados e investigados al radicar la demanda.

Cómo cuánto tiempo coincidieron Edgar y Dapena en la oficina, o sea, que estuvieran los dos trabajando a la vez?

Yo no recuerdo bien cuanto tiempo estaban juntos. Más de un año estoy seguro. Edgar Irizarry tenía durante todo el tiempo que trabajar para los dos negocios afuera de la oficina. Tenía una estación de gasolina en Cataño y una finquita de pollos en otro sitio, y 'habían' mucho tiempo que él estaba fuera de la oficina y decía que estaba haciendo investigaciones, pero nosotros sabíamos que estaba atendiendo sus negocios, pero él es íntimo amigo, especialmente de Stanley, y yo nunca 'rechazó' un empleado de empleo y Stanley no 'puede' tampoco. Por fín Irizarry 'venía' a la oficina con un . . . esa no es la contestación en la pregunta, no sé si usted está interesado, pero por fín Irizarry 'venía' a la oficina con una idea de negocio en una corporación o fábrica de . . . ¿Cómo se llama? . . . telas (Interrupción)

Velas?

Velas, con dos hombres, uno de España y otro de Venezuela y primero Edgar quería que Stanley y yo invirtiéramos dinero en este negocio. Yo dije, primero no tengo, y segundo, si voy a invertir, no voy con estos dos hombres. El se puso muy . . . ¿Cómo se dice? . . .

Se molestó?

Se molestó. Al venir a nosotros a formalizar un . . . para pedir exención contributiva bajo la Ley, él dijo que si ellos van a pagar honorarios o van a hacer algún trabajo, ellos ofrecen a nosotros acciones por eso. Nosotros dijimos que no; que no vamos a trabajar para una corporación en esas condiciones. Desde este momento, cuando rechazamos esta 'operación' Edgar Irizarry se puso en contra nosotros. El renunció al trabajo. Inmediatamente después de eso. Entonces un día él venía a la oficina y él 'punió' a Stanley; y después de eso radicó una demanda en el Departamento del Trabajo para 'over time'. Vino un investigador del Departamento del Trabajo y pusimos toda la oficina a disposición de este señor, y él investigó todo y tuvo entrevista con cada uno de los empleados privadamente, con Rafi Dapena también. Por fin el Departamento del Trabajo

encontró que Edgar Irizarry no tenía derecho a ningún 'over time'. Después de eso Edgar Irizarry radicó otra demanda en otra oficina del Departamento del Trabajo en Bayamón. El Fiscal Gil se encontró conmigo un día en la Corte Federal, y por la moción que yo había (Interrupción)

Cuál moción?

Tengo un caso que refirió el Lic. Gerardo Ortiz del Rivero contra el Gobierno Federal, basado en una práctica de la Administración de Veteranos, y yo creo que es un caso bueno. Lo refirió a nosotros diciendo que él no está en condiciones de trabajar casos civiles; que él se dedica a casos criminales. Yo radiqué demanda. Ese es el caso de Amalia Torres contra el Gobierno Federal. Yo radiqué demanda contra el Gobierno Federal bajo el Federal Tort Claim Act. Inmediatamente después recibí llamada del cliente que hay un investigador de la Administración de Veteranos en su casa pidiendo una declaración jurada. Yo dije a ella que ella no debe firmar nada ni tiene que hablar nada ni tiene que hablar con nadie; solamente en presencia mía. Que ella debe decir a este señor que cualquier información la puede conseguir de su abogado. Ella estaba llorando y me dijo: 'Pero él dice que yo tengo que pensar y yo tengo que cooperar con el gobierno.' Inmediatamente yo llamé al Fiscal Gil y le dije que él no debe hacer eso. El me dijo que él no va a intervenir en los asuntos interdepartamentales del gobierno, y le dije, pero usted es el abogado del gobierno y este es un pleito y usted tiene que comportarse como cualquier abogado. Me dijo que no va a intervenir. Entonces yo lo ví el próximo día en la corte, día de mociones, y otro día hablé con él sobre eso y él me respondió igual. Que no va a intervenir en cuestiones interdepartamentales. Entonces, en la próxima semana la señora me llamó otra vez, que el investigador está en su casa pidiendo declaración; y yo dije a ella que no firmara nada; que venga a la oficina el próximo día, y al ella venir a la oficina el próximo día, y en presencia del Lic. Smith ella hizo un affidavit sobre todo eso. Entonces, con el affidavit yo radiqué moción en la Corte Federal pidiendo que el Fiscal . . . que la corte ordene al Fiscal a comportarse bajo las reglas, y que el Fiscal no podría usar un exparte 'subpoena', como lo hizo en los otros casos que yo tenía con él. Entonces fuimos a corte y discutimos esta moción frente al Juez Cancio, pero el Fiscal estaba afuera de Puerto

Rico, y uno de los otros Fiscales, Gierbolini o Córdova, discutió esta moción; y Cancio ordenó todo lo que yo pedía y el Juez Cancio me dijo 'tengo' que preparar una orden; yo preparé una orden y mandé a los fiscales para aprobación. Ellos fueron inmediatamente a la oficina de Cancio, y que yo recibí, perdóneme, yo recibí una llamada del Lic. Passalacqua, secretaric del Juez Cancio, y el Lic. Passalacqua me pidió si yo puedo discutir otra vez la semana que viene cuando Gil regrese de Estados Unidos. Le dije que sí. ¿Cómo puedo decir a un secretario del Juez Cancio que no? Entonces el viernes yo fuí a la Corte Federal a discutir otra vez esa misma moción, esta vez con el Lic. Gil. Discutimos la moción, y por fín, el Fiscal Gil 'permitió' en corte abierta que no va a seguir haciendo estas cosas con esta señora; que no va a buscar otra vez. Entonces yo pedí acción sobre la segunda parte de la moción. O sea, los 'exparte subpoena' y Gil dijo a la corte la oficina del Fiscal Federal nunca hace esas cosas, refiriéndose al caso de Vieques, pero por suerte en la corte estaban los licenciados Ramos Vargas, el Lic. Toño Bird y el Lic. Fernández Cuyar, y yo dije a corte que yo no quiero que la corte va a tratar de balancear la credibilidad del Lic. Gil y mía, pero aquí hay tres abogados distinguidos que yo puedo poner en la silla de testigos y van a declarar que en casos que ellos tuvieron en contra del Gobierno Federal, encontraron la misma cosa de 'exparte subpoena'. En este momento el Lic. Gil se puso muy furioso y el Juez Cancio dijo que él está seguro que en el futuro Gil no va a hacer eso otra vez y él dijo que estaba bien. Cuando salimos, el Lic. Gil me dijo que 'ahora vamos a coger a usted.' Desde este momento ellos están investigando. Eso fue en octubre del año pasado, si mal no recuerdo.

Después que dejaron de trabajar en la oficina de ustedes Dapena y Edgar Irizarry, alguna persona siguió el trabajo de ellos?

Siempre.

Quién?

El señor Dapena salió porque él tenía oferta en Fuentes Fluviales para una función mucho más alta de lo que podríamos pagar, y todavía yo creo que tenemos relaciones muy cordiales con él. Además tengo que usarlo en algunos casos que están pendiente. Después que salió Dapena, está trabajando Antonio Alvarez, porque nosotros no podemos estar sin investigador.

Tenemos que usar un investigador siempre. Antonio Alvarez está trabajando con nosotros ahora mismo.

Yo no tengo más ninguna pregunta. ¿Usted tiene algo que añadir?

Yo estoy dispuesto a decir cualquier cosa. Lo único, me puede decir quiénes son las personas que usted me dijo anteriormente cuando empezamos. Usted dió los nombres de Dapena, Edgar Irizarry, Félix Martínez, Viana Reyes, y habían dos más.

Yo leí la queja, y específicamente en el párrafo 3ro dice: 'Adjunto y formando parte de la presente queja se incluyen declaraciones juradas de Edgar Irizarry, Rafael Dapena, Félix Martínez, Gregorio Morales Ayala, Gregorio Arroyo, Alfredo Viana Reyes y Alfredo Arroyo.'

Gregorio Arroyo me suena, pero yo no recuerdo. Lo he visto en la Corte Federal. El abogado contrario fue Torruellas del bufete de Fiddler, y el jurado estaba 'on home jury'. No pudieron llegar a un acuerdo después de 8 horas de deliberaciones.

Se transigió ese caso?

Sí. El otro no es cliente de nosotros. Este fue un caso referido a nosotros. Fue un caso muy chiquito referido a nosotros por un abogado de New Jersey.

Quiénes propiamente le referían casos a ustedes en estas áreas de los muelles?

En Ponce originalmente habían dos abogados extranjeros de Puerto Rico, uno que se llama Samuel Cole y un socio de él. Ellos 'referían' a nosotros un grupo de casos que ellos ya atendieron. Por lo menos 30, en una sola vez, y ese fue uno de estos casos. El Lic. Ortiz Toro, Lic. Amadeo Suro. No estoy seguro si habían algunos casos de muelles entre los que refirió Charlie Juliá, pero aquí . . . hay más.

Surgieron casos a base de las visitas que hacían Edgar Irizarry y Dapena a los muelles?

Surgieron.

Casos que venían al bufete a través de las gestiones de ellos a los muelles?

En San Juan?

En cualquier sitio.

Estoy seguro que . . . . Cuando por ejemplo yo fuí a Mayagüez y Ponce que 'estaban' investigando o preparando un caso 'pal' juicio, venían otros obreros de los muelles que dijeron a nosotros: 'tengo un caso porque yo me lesioné en tal fecha,

en tal barco', y originalmente nosotros solamente cogíamos los datos porque ellos muchas veces no recordaban mucho, y fuímos al Fondo, por que el Fondo dijo a nosotros que sin contrato de los clientes no podemos coger información y entonces a veces . . . y originalmente había un contrato y después se cambió a dos porque el Fondo uno no puede sacar honorarios, solo lo que asignan la Comisión y nosotros cogimos estos contratos antes de investigar. Yo no sé porque no estaba con ellos, ellos fueron solos. Lo único que sé es que no hay en la oficina un solo caso sin contrato. Estoy seguro que ellos vinieron a la oficina y dijeron: 'Hay en Ponce tres hombres que dicen que tienen casos, fulano, fulano, y fulano', pero no estaban autorizados a contratar porque el contrato uno tiene que hacerlo con un abogado. Investigar sí, pero contratos no.

Yo no tengo nada más.

Yo no tengo nada más tampoco."

8.   Conforme a los dictámenes de este Tribunal, que en esta etapa del procedimiento no permiten a los querellados en acciones disciplinarias el conocer los hechos relatados por los testigos en la investigación—extensión de la teoría de la secretividad del sumario fiscal en causas criminales (\*\*\*) debo abstenerme de relatar, resumir o reproducir aquí las declaraciones de esos testigos. He examinado dichas declaraciones y para mí presentan fundamentalmente el mismo cuadro de acción que presentan las declaraciones de los abogados querellados.

9.   La determinación de causa probable para enjuiciar, aquí, como en todos los casos en que un proceso requiere la infracción de un acto penado o prohibido por ley, es una función judicial que se descarga tomándose en consideración no sólo la existencia de unos hechos imputados, sino también si tales hechos constituyen, a la luz de la ley aplicable, actos sujetos a ser perseguidos judicialmente.

---

(\*\*\*) Tal vez esta norma deba ser eventualmente reexaminada, particularmente en este tipo de acciones, a la luz de criterios más avanzados sobre el discurrir del proceso adversativo.

Antes de exponer unas conclusiones finales, deseo referirme a ciertos dictámenes del Tribunal Supremo de los Estados Unidos, que en esencia y espíritu, son aplicables a la situación del caso presente, en las circunstancias de sus hechos.

En *Brotherhood of Railroad Trainmen* v. *Virginia, ex rel. Virginia State Bar,* 377 U.S. 1 (1964), el Tribunal Supremo revocó un *injunction* decretado a instancia del *Bar* de Abogados de Virginia (La American Bar Ass'n se unió como *amicus curiae* en favor de la confirmación) que prohibía, por considerarlo un acto de solicitación ilegal de litigios y práctica no autorizada de la profesión, el que una Unión alentara a sus miembros lesionados o sus familiares el obtener asistencia legal para hacer reclamaciones, y el que la Unión recomendara a *determinados* abogados para dar esa asistencia.

Se resolvió que el *injunction* infringía derechos garantizados por la Primera y Decimocuarta Enmiendas.

Se atacó particularmente aquella parte del *injunction* que prohibía el designar determinados abogados como los únicos aprobados por la Unión para representar a sus miembros y familiares, y el solicitar o alentar tal representación legal de los abogados seleccionados. La Unión aceptó que realizaba esos actos.

Sosteniendo que las garantías de la Primera Enmienda de libertad de palabra, de reunión y de petición protegían a estos trabajadores unionados en su derecho a asistirse mutuamente, y que el derecho a procurarse asistencia legal y a determinar qué abogados eran de su particular confianza formaba parte inseparable de su derecho constitucional de ayudarse unos con otros, dijo el Tribunal:

"Virginia indudablemente tiene amplios poderes para reglamentar la práctica legal dentro de sus fronteras, pero hemos tenido ocasión en el pasado de reconocer que al reglamentar el ejercicio de la profesión, un Estado no puede ignorar los dere-

chos de los individuos garantizados por la Constitución. Pues como dijimos en *NAACP* v. *Button,* supra, 371 US, a la pág. 429, 'un Estado no puede impedir el ejercicio de derechos constitucionales con meras clasificaciones' [*labels*]. Lo que aquí Virginia ha tratado de parar no es una comercialización de la profesión legal que pudiera amenazar la estructura moral y ética de la administración de justicia. No es '*ambulance chasing*'.

.   .   .   .   .   .   .   .   .   .

Un Estado no puede, invocando el poder de reglamentar la conducta profesional de los abogados, infringir de manera alguna el derecho de individuos y del público de estar justamente representados en pleitos autorizados por el Congreso para llevar a cabo un básico interés público. No puede esperarse que los legos sepan cómo proteger sus derechos cuando lidian con adversarios experimentados y cuidadosamente aconsejados legalmente. [cita] y el que se asocien para ayudarse mutuamente para mantener y hacer efectivos derechos concedidos bajo leyes federales no puede condenarse como una amenaza a la ética legal . . . . El derecho a pedirle a las cortes no puede ser de esa manera impedido.

.   .   .   .   .   .   .   .   .

En el presente caso el Estado ha vuelto a fracasar en demostrar interés público alguno apreciable al impedir a la Unión que ponga en efecto su plan de recomendar abogados seleccionados por ella para representar obreros lesionados . . . y por supuesto, abogados que aceptan trabajo bajo este plan constitucionalmente protegido, tienen una similar protección que el Estado no puede menoscabar."

Posteriormente, en 1967, el Tribunal Supremo en *United Mine Workers* v. *Illinois St. Bar Ass'n,* 389 U.S. 217, reafirmó los anteriores principios ante el empleo, por una Unión, y pagados por ella mediante sueldo u honorarios, de abogados que representaran a sus miembros y familiares en reclamaciones por accidentes del trabajo bajo esa ley del Estado.

Revocando el *injunction* que a solicitud del *Bar* de abogados decretó Illinois prohibiendo esos actos, resolvió el Tribunal Supremo que dicho *injunction* violaba la libertad de

palabra, de reunión y la de petición de la Enmienda Primera, con obligatoriedad para los Estados a través de la Decimocuarta.

"La Enmienda Primera sería una promesa hueca si dejara al gobierno en libertad de destruir o corroer sus garantías con '*restricciones indirectas*' siempre que no se pasare una ley prohibiendo la libertad de expresión, prensa, de pedir o de reunión. Hemos sostenido por lo tanto repetidamente que leyes que en realidad afectan el ejercicio de estos '*derechos vitales*' no pueden sostenerse meramente porque se aprobaron con el fin de habérselas con algún mal dentro de la competencia legislativa del Estado. . . . [citas]. . . Que los Estados tienen amplio poder para reglamentar la práctica legal está, por supuesto, fuera de duda. [cita] Pero es igualmente obvio que normas latas confeccionadas para proteger al público y conservar el respeto para la administración de justicia no pueden en su aplicación efectiva menoscabar significativamente los valores de las libertades de asociados. . . . La Primera Enmienda no protege la expresión y la reunión sólo en tanto se caracterizan como 'políticas'. Grandes causas seculares, así como las pequeñas están protegidas. . . . Y el derecho a la libertad de palabra y de prensa no está limitado a ningún área de interés humano." (Énfasis puesto.)

Aun cuando existe alguna diferencia en los hechos de unos y otros, los casos de *Railroad Trainmen* v. *Virginia Bar* y *United Mine Workers* v. *Illinois Bar* son reafirmaciones de los enfoques básicos hechos por el Tribunal Supremo en *N.A.A.C.P.* v. *Button,* 371 U.S. 415 (1962).

Se atacó aquí la validez de legislación del Estado de Virginia que prohibía la "solicitación impropia de asuntos legales" en tanto le fue aplicada a la N.A.A.C.P. Esta alentaba la presentación de casos relacionados con sus fines y propósitos, y ofrecía asistencia legal a través de sus abogados. La Corte Suprema de Apelaciones dictaminó que la legislación reforzaba los estatutos existentes para mayor regulación de los males de la solicitación de asuntos legales, y concluyó que las actividades envueltas violaban también los cánones 35 y

47 de Ética Profesional de la Asociación Americana de Abogados, adoptados por Virginia. Revocando la decisión que sostuvo la validez de la prohibición dice el Tribunal:

"Nos enfrentamos de inmediato al argumento de que la "solicitación' está totalmente fuera de las áreas de libertad protegidas por la Enmienda Primera. A este argumento hay dos contestaciones. El primero es que un Estado no puede impedir el ejercicio de derechos constitucionales a través de meros nombres [*labels*]. El segundo es que la discusión en abstracto no es la única clase de comunicación que la Constitución protege; . . . .

Concluimos que bajo el Capítulo 33, según ha sido autorizadamente interpretado por la Corte Suprema de Apelaciones, una persona que aconseja a otro que sus derechos legales se han infringido y lo refiere a un determinado abogado o grupo de abogados (. . . .) para asistencia ha cometido un delito, *como lo ha cometido el abogado* que a sabiendas ofrece asistencia en esas circunstancias. . . .

Como dijo esta Corte en *Thomas* v. *Collins*, 323 US 516, 537, 'el libre intercambio en ideas' significa libre intercambio en la oportunidad para persuadir a la acción, no meramente para describir hechos.

.    .    .    .    .    .    .    .

El segundo argumento es que Virginia tiene un interés subordinado en la reglamentación de la profesión legal comprendida en el Capítulo 33 . . . . Las decisiones de esta Corte han sostenido consecuentemente que sólo un *apremiante* interés del Estado en la reglamentación de un asunto dentro del poder constitucional de reglamentación del Estado puede justificar el que se limite las libertades de la Primera Enmienda. Así no es una contestación a las demandas constitucionales hechas por la peticionaria decir, como lo ha dicho la Corte Suprema de Apelaciones de Virginia, que el propósito de esta reglamentación fue meramente el asegurar altas normas profesionales y no el restringir la libre expresión. Porque un Estado no puede, bajo el pretexto de prohibir mala conducta profesional, ignorar derechos constitucionales. [citas] . . . . 'En el ámbito de estas libertades *indispensables,* sea la de palabra, de prensa o de asociación, las decisiones de esta Corte han aceptado que, aun cuando no lo fuera intencionalmente, la privación de estos derechos

puede resultar de una variedad de acción gubernamental'." (Énfasis puesto.]

10. Decía Sir Francis Bacon en su Ensayo sobre la Judicatura, que es el deber de un juez el apreciar no sólo *los hechos* sino también *las circunstancias* de cada caso.(\*\*\*\*) En este caso, las circunstancias son para mi convincentes de que no ha habido una conducta antiprofesional que justifique, al correr de los años, forzar a estos abogados a afrontar un proceso y defenderse de tal supuesta conducta, a saber:

i. Siendo el bufete a que pertenecían estos abogados el que produjo la norma de derecho que reconoció a infinidad de obreros lesionados a bordo de barcos sitos en las aguas territoriales de Puerto Rico una causa de acción en almirantazgo en el foro exclusivo federal, era lógico, e inevitable, que todos aquellos interesados buscaran su intervención y sus servicios profesionales.

ii. Era lógico, e inevitable, que hubiera una gran acumulación de reclamaciones a la vez, sobre todo ante el peligro de la prescripción o de la incuria bajo las normas de almirantazgo.

iii. Estando unionados estos obreros, y estando repartidos a través de todos los puertos de Puerto Rico, y habiendo *un solo* foro en todo Puerto Rico donde litigar, era lógico e inevitable que hubiera relación entre la Unión o Uniones a que pertenecían estos obreros reclamantes, los líderes de dichas Uniones y estos abogados querellados.

iv. Bajo los casos citados, ellos, los obreros, y los abogados, tenían un derecho constitucional a esta relación y comunicación, y constitucionalmente tenían ellos, los obreros, y sus abogados, el derecho a usar de aquellos mecanismos de relación y de comunicación que permitieran del modo *más eficaz* el tramitar esas reclamaciones, tanto para que no se perdiera ninguna por falta de la debida información y obten-

---

(\*\*\*\*) The Harvard Classics, Vol. 3, pág. 132. *Judicis officium est, ut res, it tempora rerum.*

ción de prueba y de testigos, como para evitar, en las circunstancias en que ocurrieron los hechos, la presentación de reclamaciones falsas o fabricadas. Las declaraciones de los abogados querellados explican a satisfacción la necesidad de estos mecanismos de comunicación, para protección también de ellos mismos contra de engaño o la falsa información, que dicho sea, no los crearon ellos, sino que ya estaban aquí creados esos mecanismos por la firma de abogados de Nueva York que litigaba casos de obreros en la Corte Federal.

v. Ante una litigación de clase que afectaba, y en la cual tenía interés una gran masa de obreros, sería un puro candor esperar que cada obrero, sin comunicarse o relacionarse con los otros unionados y sus líderes, fuera por sí solo a presentar su reclamación. La experiencia demuestra que eso no ocurre así, ni ha ocurrido en relación con los pleitos obreros y de unionados que se han litigado en nuestras cortes. El récord demuestra que en una que otra ocasión que acudieron a otros compañeros abogados, éstos, creyéndose desconocedores de la materia, los referían a los querellados. Desde que se litigó uno de los primeros casos obreros en gran escala, que culminó en la liquidación de la Compañía del Ferrocarril en Puerto Rico, y en el curso de una extensa litigación de esta naturaleza, de interés colectivo de clase a través de los años, en que necesariamente se han usado mecanismos iguales (de otro modo hubiera sido imposible una efectiva gestión profesional), en momento alguno ha considerado nuestro foro ser ésta una práctica antiprofesional de distinguidos y prestigiosos abogados que intervinieron.

11. Aludiendo a las expresiones de los querellados, el Procurador General invitó a declarar a los denunciantes, entonces Fiscal Auxiliar Lcdo. Gilberto Gierbolini Ortiz y Fiscal Lcdo. Gil. Manifestó el Procurador General para el récord que el Fiscal Gil declinó testificar. El Lcdo. Gierbolini declaró. Sujeto a la norma señalada, no expondré los hechos declarados por él. Sin embargo, el testigo hizo una

*conclusión de derecho* como motivación en parte de su denuncia, con referencia a una "anotación" que había leído en "American Law Report Second", en el sentido de que una firma legal que controle cierto tipo de litigación en una corte, debe poner a la corte sobre aviso de que se pueda estar incurriendo en *ambulance chasing*. Se apoyó en que la firma querellada ocupaba 3/4 partes del calendario de vistas señaladas en la Corte Federal para esos años de 1961 y 1962.

Esos calendarios están en el récord como prueba documental. No voy a divulgar su contenido, pero el examen de los mismos me demuestra que el hecho es secuela, e inevitable resultado, de las circunstancias antes descritas sobre esta litigación de interés de clase, y del cúmulo de reclamaciones legítimas a que de momento dio lugar la decisión de la Corte de Apelaciones en *Guerrido*. En todo ello hay una relación de causa y efecto no tomada en cuenta por el denunciante que desvirtúa su conclusión.

Durante varios años postulé como abogado en representación del Gobierno ante el entonces Tribunal de Contribuciones. Luego fui Juez en el mismo. Ese Tribunal, al igual que la Corte Federal, era uno de jurisdicción especializada, sobre todo el territorio de Puerto Rico.

Nadie pudo pensar que un número exiguo de prestigiosos abogados del foro estuvieran incurriendo en conducta antiprofesional de la aquí imputada porque controlaran, marcadamente, los calendarios de la litigación contributiva. Parecido hecho de llamado "control" ocurre con la comparecencia de determinados agobados ante organismos especializados que ejercen función judicial. Ello es consecuencia de la especialización en ciertas áreas de litigación.

Aparte de su legítimo derecho a recibir honorarios como consecuencia de la profesión que ejercen, las circunstancias del récord me convencen que los querellados realizaron una labor social en defensa del derecho de muchos obreros y trabajadores, varios de ellos mutilados como consecuencia de

lesiones del trabajo, a obtener una legítima compensación que las leyes del Congreso les concedía, y que no se les había hecho valer.

Ante una norma sobre conducta profesional imprecisa y vaga, que por serlo, en determinadas situaciones puede funcionar de manera acomodaticia, y que se quiere, tardíamente, reivindicar ahora después del transcurso de varios años, para mí el balance de conveniencia está en esa labor profesional que resultó en gran beneficio de una clase pobre y humilde de litigantes, más necesitada que nadie de asistencia profesional en las circunstancias en que la obtuvo en este caso y que no la encuentra en otras esferas sociales porque no tiene acceso a ellas. (¹)

Como dice el Juez Brennan en *Button,* antes citado, refiriéndose a la vaguedad en la norma:

"No hay diferencia en que el caso de autos no era una acusación criminal. . . . La cualidad objetable de la imprecisión y latitud no depende en la ausencia de justa notificación a un acusado criminalmente, o en la irrestricta delegación de poderes legislativos, sino en el peligro de que se tolere, en el área de las libertades de la Primera Enmienda, la existencia de un estatuto penal susceptible de una aplicación abarcadora e impropia. [Citas] Estas libertades son delicadas y vulnerables, así como sumamente preciosas en nuestra sociedad. *La amenaza de sanciones* puede entorpecer su disfrute casi tan potentemente como *la efectiva aplicación de sanciones.*" (Énfasis puesto.)

Entiendo que este proceso envuelve amenaza de sanciones en un área constitucionalmente protegida, sin que el récord contenga suficiente base para hallar causa probable de una práctica profesional prohibida. Como expresé antes, esta conducta profesional fue juzgada ya en su propio foro, el cual no está carente de normas de ética y de buena con-

---

(¹) Quizás por lo vaga e imprecisa de esta norma el Colegio de Abogados, a quien por ley corresponde la función por excelencia de velar esta conducta profesional, no ha producido caso alguno ante este Tribunal imputando la violación de este norma.

ducta. Sobre el mismo récord, convengo plenamente con el Hon. Hiram Cancio en el sentido de que no era de extrañarse el que los denunciantes no produjeran allí los cargos, según ordenado, porque las alegaciones de los testigos no aparecían tener base en evidencia creíble de actos antiprofesionales.

He expresado las razones de mi disenso.